NOTICE

Decision filed 05/06/22. The
text of this decision may be
changed or corrected prior to
the filing of a Petition for
Rehearing or the disposition of
the same.

2022 IL App (5th) 190446-U

NO. 5-19-0446

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 18-CF-312 |
| | ) | |
| NICHOLAS A. M. HASTINGS, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's convictions and sentences are affirmed because the trial judge did not err when he (1) granted the State's motion *in limine* and allowed the defendant's rap music video to be admitted into evidence and shown to the jury, (2) allowed the State's proposed limiting jury instruction with regard to the video, and (3) sentenced the defendant, where there is no factual support for the defendant's claim that the trial judge considered an improper factor when determining the defendant's sentences.

¶ 2    In this direct appeal, the defendant, Nicholas A. M. Hastings, challenges his convictions and sentences after a trial by jury in the circuit court of Jackson County. For the following reasons, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4    The facts necessary to our disposition of this appeal are as follows. On August 7, 2018, the defendant was charged, by information, with one count of armed robbery and one count of

1

aggravated battery with a firearm. The first count charged that, on or about August 3, 2018, the defendant "knowingly, while armed with a firearm, took property, being a cellphone, from Jordan Kaufman by threatening the use of force and personally discharging the firearm causing great bodily harm to Jordan Kaufman." The second count charged that, on or about August 3, 2018, the defendant, while committing a battery, "knowingly and without legal justification discharged a firearm other than a machine gun or firearm equipped with a silencer and thereby caused great bodily harm to Jordan Kaufman, in that the defendant shot Jordan Kaufman in the area of his abdomen." A document filed with the information indicated that the defendant was born in July of 1995, and thus was 23 years old at the time of the alleged offenses. On April 1, 2019, the State, with leave of court, filed an amended information that changed slightly the wording of the armed robbery count, and that is not material to the issues raised by the defendant in this appeal.

¶ 5     Also on April 1, 2019, the State filed a motion *in limine* for the admission of a video at the defendant's upcoming trial. The State alleged therein that Kaufman was expected to testify at the defendant's trial that on or about August 5, 2018, Kaufman located and viewed, "without the aid of law enforcement," a video that was posted publicly on YouTube by an "Eside Dodie," and that while viewing the video, Kaufman recognized in the video the man who had robbed and shot him. Prior to viewing the video, Kaufman had not been able to identify his assailant. The State further alleged that another expected witness at trial, Katera Barners, was expected to testify that the defendant goes by the nickname "Eside Dodie," and that two detectives from the Carbondale Police Department were expected to identify the defendant at trial as the man depicted in the video by "Eside Dodie." The State asserted that it wished to introduce the video at trial because the video "constitute[d] the means by which Jordan Kaufman identified the defendant as having robbed him and shot him on August 3, 2018." The State asked the trial judge to conclude that the video's probative value was not substantially outweighed by any danger of unfair prejudice.

2

¶ 6    On April 10, 2019, the defendant filed an objection to the State's motion *in limine*, contending that the video—which the parties noted was entitled "Shots Fired (Ready for War)"—was "overly prejudicial," lacked probative value, and contained evidence of other crimes or bad acts. The defendant noted that prior to viewing the video, Kaufman had failed to pick the defendant out of a lineup shown to him by police on the day he was shot. The defendant asserted that the video was overly prejudicial because it depicted him "holding what appears to be a semiautomatic handgun and rapping about committing assorted violent acts and crimes including robbery." The defendant characterized the video as "a fictional rap video" with little or no probative value. The defendant asserted that showing the video to the jury was not necessary because Kaufman could describe the circumstances that led to his identification of the defendant without the video being shown.

¶ 7    On April 11, 2019, the State filed a second motion *in limine*, this time to move to admit "intricately intertwined evidence or in the alternative other crimes and other bad acts evidence." The State contended that Kaufman's anticipated testimony would show that at the time Kaufman was robbed and shot, he was attempting to purchase a controlled substance from Barners, and that Barners' anticipated testimony would show that at the time of the incident, "the defendant possessed controlled substances, being prescription pills."

¶ 8    Also on April 11, 2019, a hearing was held on the State's first motion *in limine*. The State argued for the admission of the defendant's rap music video for the reasons stated in its motion, and in addition argued that the video was "relevant to show the defendant's motive, to show the defendant's intent, to show the defendant's absence of mistake, and absolutely relevant on the point of identification." The State added, "There's a direct connection to the facts of this case as well as to the investigatory steps taken by the officers." The State noted that the defendant had filed a discovery answer that indicated that the defendant planned to assert an alibi defense, which

made identification even more central to the case, and made it unfair to the jurors to ask them to decide the case without seeing the video that led Kaufman to his identification of the defendant. The State further argued that there was no allegation that the defendant did not have the right to possess a handgun in the video, and the rapping in the video was not about specific, real crimes, which lessened the prejudicial value of the video. Thus, the State argued, to the extent the video could be said to depict other crimes or other bad acts, it was not being offered "to show the defendant's propensity to commit crimes or to commit this crime." The State also contended, *inter alia*, that a limiting instruction to the jury would further reduce the potential for any unfair prejudice to the defendant.

¶ 9    The defendant argued that the video was "incredibly prejudicial," in part because "our culture has a problem with confusing the reality of an actor playing a role with the reality of the situation," which meant that the jury was likely to conclude from the video that the defendant had a propensity to commit violent crimes. He argued that the cases cited by the State in support of the admission of the video were distinguishable because "those other crimes [or] bad acts in the cited cases are reality. It's not fiction. You know, in this case, the rap video is fiction. It's not reality. It's not true." He argued that accordingly, although the video "may have some evidentiary value as to identification," its prejudicial effect would be tremendous and unwarranted. He further argued that he did not believe the video showed motive, intent, or absence of mistake, because it was created "a year or two" before the incident involving Kaufman.

¶ 10    In rebuttal, the State, *inter alia*, reiterated its argument with regard to identification, noting that the video was especially significant in light of Kaufman's failure to pick the defendant's photo out of a lineup. The State argued that "a picture is just a picture," which "depicts a person in one particular way," leaving "no way to determine that person's mannerisms or perhaps other distinguishing characteristics about an individual." The State argued that, in contrast, "[a] video is

4

a little different," because "a person or a viewer is able to see a little bit more about a person rather than just one, you know, snap, snap picture." Accordingly, the State argued, the video was extremely important with regard to showing "how the victim in this case was able to identify his shooter." The State added that it believed the jury would be able to make the distinction between fact and fiction, and would understand the difference between "artistic expression" and reality.

¶ 11 The trial judge noted that the video was "being offered for the victim to show the identity or the alleged victim to show the identity of the alleged person who committed the act in question, whether or not the limiting instruction will be appropriate in this situation." He ruled that the video would "be allowed in this particular situation after conducting the balancing test and considering all of these factors in light of the specific facts in this case, it will be admitted for that, for those purposes."

¶ 12 On April 15, 2019, the defendant's jury trial began. Prior to *voir dire*, the trial judge ruled on the State's second motion *in limine*, finding that the evidence about the defendant's alleged possession of prescription pills without a prescription would be admissible at the trial. On the morning of April 16, 2019, the parties gave their opening statements. The State noted that it expected the evidence to include a video that the victim used to identify the defendant as his assailant. The State did not mention that the video was a rap music video, or that it contained violent words or images. Counsel for the defendant also mentioned the video, which he referred to as "a rap music video." He added, "And by the way, the rap music video is lyrics about robbing and street crime and all kinds of posturing and all kinds of stuff that is very common in some genres of rap music." Later in his opening statement, he referred to the video as "a fictional rap video."

¶ 13 The first witness to testify at the trial was Jordan Kaufman. He testified that on August 3, 2018, when he was 17 years old, he made plans to meet Barners, who he had met while both

attended school at Rebound in Carbondale, and from whom he had purchased Xanax pills approximately 10 times in the 7 months prior to August 3, 2018. He testified that on August 3, 2018, he sought to purchase Percocet pills from Barners, although he conceded that when he first discussed the robbery and shooting with police, he told them he had sought to purchase marijuana from her. He testified that he contacted Barners via Snapchat, they agreed to meet at a parking lot near Rebound at around 3 p.m., and he got a ride from a friend, Devan Walls, to get from his home in DuQuoin to Carbondale. Kaufman testified that when he and Walls arrived at the parking lot, he saw Barners in the driver seat of a vehicle, and that he entered the left rear passenger seat of her car, behind where she sat, while Walls remained in the car they had arrived in. Kaufman testified that an African American male with circular eyes, "dreads, kind of a skinnier build" was sitting in the front passenger seat beside Barners. He testified that he had never met the man before, did not know his name, and was not introduced to him. He then authenticated a photograph of the car that Barners was driving, which was marked as People's Exhibit Number 5, and authenticated an additional photograph of the inside of the car, People's Exhibit Number 6.

¶ 14    Kaufman testified that after he and Barners had an extremely short conversation about Rebound, the man in the front seat turned to face Kaufman, pointed a gun at Kaufman, and told Kaufman to give him "everything" Kaufman had in his pockets. Kaufman testified that the man looked "serious and angry," and that he gave the man the $120 in cash that he had planned to use to purchase the pills. He testified that the man told him to get out of the car, but that he could not because of a problem with the lock on the rear door. He testified that he rolled down the window and tried to open the door from the outside, and that as the door opened, "the gun went off," and the man "shoved" him out of the car. He testified that his phone fell out of his pocket while he was struggling to get out of the car, and that he left it there. He testified that he ran to Walls' car, and that Walls drove him to the hospital. He testified that at the hospital, he picked Barners out of a

6

lineup of females that was presented to him by the police, but he could not identify the man from a subsequent lineup of males that was presented to him at the hospital.

¶ 15     Kaufman testified that while recuperating at home a few days later, he was watching music videos on YouTube. He watched a video by Eside Dodie entitled "Ready for War." He testified that he recognized the man who shot him based upon the "movements and facial expressions" of the man in the music video. He testified that the man was the same man he had "seen in Katera's car," and that he had watched the video in the past, approximately two or three months before the robbery and shooting, when a friend showed it to him. He testified that the video showed up on his recommended list after the shooting because he had watched it before. He authenticated a copy of the video, which was marked as People's Exhibit Number 9, admitted into evidence, and viewed by the jury. As the video was played for the jury, Kaufman, at the request of the State, identified the man in the video as the man who shot him on August 3, 2018. He testified that upon watching the video at home, he "[a]lmost immediately" recognized the man as the person who shot him. He testified that the presence of guns in the video did not affect his identification of the man, which he testified was based on the man's "eye shape and his long dreads." He authenticated a copy of a photograph of a still frame from the video, which was marked as People's Exhibit Number 9-A, and also was admitted into evidence. Kaufman testified that he recognized the man who shot him as the man in the photograph due to the man's "hair and the eye shape." When asked if the person who shot him was present in the courtroom, Kaufman identified the defendant as the man who shot him. He also identified the defendant as the person in the video.

¶ 16     Kaufman was then shown the photograph of the defendant that was presented to him in the hospital soon after the shooting as part of the lineup of males. Kaufman testified that he did not believe it looked like the defendant, because in the lineup photograph he could not "see any facial features," and could not see the defendant's eyes, which were the main part of the defendant that

7

led Kaufman to identify him. He further testified that the defendant's "serious and angry" demeanor at the time of the robbery and shooting was "more like" the rap music video than the lineup photograph he was shown at the hospital, in which the defendant was "[s]miling."

¶ 17    Subsequently, Kaufman was asked by defense counsel if the fact that "the video contains statements about guns, robbing, various crimes," impacted Kaufman's identification of the defendant. Kaufman testified, "No. I identified the person because that was the same person I had seen in the vehicle." He agreed that he told a police detective that the defendant "obviously says he does this a lot in his music video." He thereafter agreed that "all music videos aren't true," and that they are "show business" and "entertainment." He denied defense counsel's suggestion that he was "confusing these images in this video with this incident." When questioned further by the State, Kaufman testified that he was certain that he was not confusing the images in the video with the actual robbery and shooting because he recognized the defendant as his assailant at the outset of the video, before he saw any guns in the video or heard any lyrics about robbing people.

¶ 18    Kaufman's mother testified that when Kaufman recognized the person who shot him in the video after being released from the hospital and returning home, Kaufman pointed the person out to her. She testified that Kaufman was "[s]cared to death" while showing her the video, with him visibly shaking, his voice shaking, and him practically in tears. The next witness, Devan Walls, testified consistently with Kaufman with regard to their trip to Carbondale on August 3, 2018. He testified that because of the tinted windows in his car, he could not observe the occupants of the car Kaufman got into, and was shot in.

¶ 19    Various law enforcement officers testified throughout the trial. Of significance to the issues raised by the defendant in this appeal, Carbondale police detective Jennifer Brooke Lam testified as to video footage that was taken by surveillance cameras near Rebound around the time of the shooting. She testified that no individuals were discernible in the footage, but that a black 2016

8

Chevrolet Cruze automobile, which she described as the "suspect vehicle," was visible "traveling southbound on North Springer Street" in the video. She identified the suspect vehicle as the video was played for the jury, and also identified it in a photograph taken from a still frame from the video. Subsequently, she testified that during the course of her investigation of the robbery and shooting, she became familiar with both the defendant and Katera Barners, and she learned that the defendant goes by the nickname "Eside Dodie." She testified that she obtained Facebook records that included message conversations, several hours after the robbery and shooting of Kaufman, between accounts believed by Lam to belong to Barners and the defendant, with the defendant using an account with the name "Eside Dodie" that featured a profile video of the defendant holding a gun. At the request of the State, Lam read several of the messages aloud. None of the messages directly mentioned a robbery or shooting.

¶ 20    Katera Barners testified after Lam. Barners testified that in October of 2018, she pleaded guilty, in a juvenile case, to the Class 1 felony of conspiracy to commit armed robbery, as a result of her involvement in the robbery and shooting of Kaufman. She testified that she was sentenced to one year of probation, spent approximately "a month and a week" in jail, and served time on home confinement. She testified that there was no agreement that she had to testify against the defendant. She testified that she conspired with the defendant—with whom she had a dating relationship in August of 2018—to rob Kaufman. She identified the defendant in court. She testified that currently she was 18 years old, and that at the time she arranged the pill transaction with Kaufman on August 3, 2018, the defendant was present and was directing her what to say to Kaufman over Snapchat. She testified that she and the defendant decided together to rob Kaufman, although she was not certain why, because they "both were working, so it's not like we were hurting for money or anything." She testified that they did not plan to shoot Kaufman, and planned

9

only to take his cash. She testified that she did not know the defendant had a gun with him until they executed the robbery.

¶ 21    Barners testified that she drove the defendant's uncle's car, which she identified as the car shown in People's Exhibit Number 5, to Rebound, and that the defendant sat in the front passenger seat. She testified that she "was looking forward the whole time" the robbery and shooting occurred, and could not describe what happened in detail. She did not see the defendant with the gun until after the shooting, when the defendant told her to drive away. They returned to the house where the defendant lived on West Meadow Lane in Carbondale, the defendant changed clothes, and Barners drove the defendant to his job at NeuroRestorative, which was about a "five, seven, minute" drive from the house. She testified that prior to that, as they left the scene of the shooting, the defendant told her that the shooting was an accident. She testified that after she dropped the defendant off at his place of work, she went to work at Burger King. While working there later in the evening, she had Facebook conversations with the defendant. She testified that the defendant used the nickname "Dodie." She testified that the messages she received from the defendant indicated that he was listening to the police scanner, and did not think the police were looking for him. She testified as to other messages that she said referred to the robbery and shooting, and their hope that they would not be discovered as the perpetrators of it. She testified that later that night, she was arrested by Carbondale police officers for her involvement. She conceded that she originally told police that Kaufman had asked to buy "weed" from her, and that Kaufman tried to rob her, which was not true. She testified that because she was scared, she also told police that Kaufman had a gun, which also was not true. Barners authenticated recordings of phone calls made from the defendant to her when the defendant was in jail, after she had been released. She testified that in the phone calls, which were played for the jury, the defendant essentially asked her if she was going to fight the case with him, instead of pleading guilty. She testified that initially, he had

left her "sitting in jail by [herself] for a month to take all the charges by [herself]," which made her feel "[p]retty bad," even though she believed the defendant loved her.

¶ 22    On cross-examination, Barners testified that she was "[n]ot really mad" at the defendant, but "was just disappointed" in him for leaving her in jail. She agreed that she told police the defendant was "very soft" and not like he acted in his rap music videos, which she agreed were about creating "an image," and were "popular" and what people wanted to see. She agreed again that the videos did not depict the "real" defendant. She conceded that if she had been charged as an adult, she would have faced a long prison sentence if convicted. On redirect examination, she testified that she was a juvenile at the time of the robbery and shooting, and that she was upset that even though she did not shoot Kaufman, and the defendant did, she ended up being arrested first and going to jail, while the defendant did not get arrested and jailed until later. She testified that her testimony in court was truthful, and that she had not been truthful when she first told police that Kaufman had a gun and attempted to rob her.

¶ 23    On the following day, April 17, 2019, testimony in the case resumed. Of significance to this appeal, Carbondale police officer Stephanie Dillow testified that as a detective at the time of the shooting, she reviewed surveillance footage that showed a black Chevrolet Cruze traveling, just after the time of the shooting, on a route that led from the scene of the shooting to West Meadow Lane. She authenticated a video copy of the surveillance footage, and a photograph from a still frame from the video. She also testified as to the approximate amount of time it would take to get from the scene of the shooting to West Meadow Lane by car, and from West Meadow Lane to the NeuroRestorative facility at which the defendant was employed, also by car.

¶ 24    Phonda Sanders testified that she was a supervisor at the NeuroRestorative facility at which the defendant worked on August 3, 2018, and that she was a record keeper familiar with how the time clock system for the facility worked. She identified the defendant in court, and testified that

11

he was a former employee of NeuroRestorative. She testified that on August 3, 2018, the defendant clocked into work at the facility at 4:08 p.m., and clocked out that evening at 8:54 p.m. She also authenticated video surveillance footage of the defendant at the facility on that date, and noted that at that time, the defendant had long dreadlocks.

¶ 25    Carbondale police officer Jesse Ital testified that on August 3, 2018, he made contact with Kaufman at the hospital emergency room. He testified that Kaufman described his assailant as "a light-skinned black male, skinny, with long dreads." He testified that the following day, after learning of the possible involvement of Barners and the defendant in the shooting, he went to the home on West Meadow Lane where the defendant lived with his grandparents and uncle, and observed "a black Chevrolet four-door passenger car sitting in the driveway," which he believed matched the description of the car suspected to have been used in the robbery and shooting. Ital authenticated a photograph of the car outside of the home on West Meadow Lane, and testified that People's Exhibit Number 5 was also a photograph of the car he observed outside of the home. He testified that when two individuals later identified as the defendant's uncle and the defendant's grandmother emerged from the home, he asked them if they would move some clothes that were piled in the back seat of the car. The defendant's grandmother did so, and Ital observed a hole in the back seat. He authenticated a photograph of the hole, and the photograph was admitted into evidence and published to the jury. Ital testified that the defendant was also present at the house that day, and he identified the defendant in court.

¶ 26    Carbondale police officer Aaron Ford testified that on August 3, 2018, he presented a photo lineup to Kaufman at the hospital, approximately one or two hours after Kaufman was shot. As per the procedure of the Carbondale Police Department, he was not otherwise involved in investigating the case, and did not know anything about the suspects in the case. He testified that from the photographs of six females, Kaufman identified a female whom Kaufman believed was

12

the driver of the car involved in the robbery and shooting. He testified that Kaufman did not identify a male from the photographs of six males. Ford testified that Kaufman told him that the male who robbed and shot him was lighter-skinned than the males in the photographs. On cross-examination, Ford testified that Katera Barners was the female that Kaufman picked out of the lineup, and that he did not appear to have any difficulty picking her out. He testified that although the defendant was in the lineup of males, Kaufman did not pick him out.

¶ 27 Carbondale police detective Lee Stewart testified that he was the officer who assembled the photo lineups for Ford to present to Kaufman. He identified the defendant in court, and testified that he included a photograph of the defendant in the lineup of males because he knew that the defendant was Barners' boyfriend at that time. After a stipulation by the parties as to the manner in which the photographs would be presented to the jury, Stewart authenticated the photographs that were in the lineup of males that was presented to Kaufman. Like Ford, Stewart testified that although the defendant was in the lineup of males, Kaufman did not pick him out. Stewart testified that Kaufman did pick Barners out of the lineup of females, as the driver of the car.

¶ 28 Stewart testified that subsequently he was contacted by Kaufman's mother, and that he thereafter interviewed Kaufman at the Illinois State Police facility in DuQuoin, because Kaufman did not want to come back to Carbondale. He testified that Kaufman showed him a video by "Eside Dodie" entitled "Ready for War," and that Kaufman told him that the man featured in the video was the man who shot Kaufman. Stewart testified that Kaufman told Stewart that one of Kaufman's friends suggested Kaufman watch the video. Stewart authenticated People's Exhibit Number 9-A, discussed above, which he testified was a copy of a photograph of a still frame from the video that showed the defendant in the video. He again identified the defendant in court, and testified that he believed the defendant was the man in Exhibit 9-A. When asked to compare Exhibit 9-A with the photograph that was included in the lineup of males, Stewart testified that in the lineup photograph,

the defendant is "smiling, and his eyes aren't fully visible as far as the whites of his eyes. There's a little bit of shadowing within that." He testified that the photograph from the rap music video "is just a little bit clearer image than this one." When asked about the difference between a video and a photograph, Stewart testified, "You can see movement, facial expressions. You can see a clearer picture of someone in a video than you can in a still shot image because you're able to see them move. You're able to see their facial expressions change within that. Whereas a still shot image is just one image." He testified that he was able to identify the defendant from the video, and that after watching the video with Kaufman, and identifying the defendant from the video, he applied for a warrant for the defendant's arrest. Stewart testified that he also obtained a warrant to search the home on West Meadow Lane, and that at the house, police discovered clothing that matched clothing the defendant was seen wearing approximately an hour before the shooting, in a surveillance video obtained from Midwest Cash. Like Barners, Stewart authenticated recordings of phone calls made from the defendant to Barners when the defendant was in jail and she had been released. On cross-examination, Stewart agreed that Kaufman, when watching the video with Stewart, made comments to the effect that the defendant stated in his rap music video that the defendant "does this a lot." On redirect examination, Stewart testified that Kaufman was never inconsistent about being robbed, or about being shot.

¶ 29    Carbondale Police Department evidence technician Dan Reed testified that he processed the Chevrolet Cruze depicted in People's Exhibit Number 5, and that while doing so, he discovered a "defect" in the driver's side rear seat that was "consistent with a bullet path, a large caliber bullet path in this case." He testified that the defect was "a penetrating defect to the seat back," and that after subsequent examination of the vehicle's trunk area, he "was able to actually find and recover the projectile in question that caused this path, this defect." Reed testified that the projectile, or bullet, "appeared to be a .45 caliber." He testified that the bullet had been fired from a firearm, and

14

was not "just loose ammunition" that was unfired. He testified that he swabbed the bullet—which was admitted into evidence—"to see if there was potentially DNA on it."

¶ 30    Illinois State Police forensic biology DNA analyst Suzanne Kidd testified that her involvement in the case consisted of DNA testing and analysis of samples submitted to her. She testified that "Jordan Kaufman could not be excluded—or is included as a possible source of that DNA" which was found on some of the materials that Reed recovered from the black Chevrolet Cruze. On cross-examination, she agreed that the defendant was excluded as a possible source of the DNA. Following her testimony, the State rested its case. Thereafter, the defendant moved for a directed verdict, which was denied.

¶ 31    The defense began its case by calling Susan Mendoza, who testified that she was the store manager at Midwest Cash in Carbondale, and that Detective Lam requested that Mendoza recover footage from the store's video surveillance cameras for August 3, 2018. She testified that she recovered the footage, and she authenticated a copy of the footage, which was admitted into evidence. As the footage was played for the jury, Mendoza testified that the defendant was visible in the top left-hand frame of the video, and that it appeared that his grandmother was with him. She testified that the time stamp on the video showed that the defendant entered the store at 2:48 p.m. on August 3, 2018, and that he left the store at approximately 3 p.m.

¶ 32    Sean Hastings testified that he was the defendant's uncle, that he owned the black Chevrolet Cruze allegedly used in the robbery and shooting, and that both the defendant and Katera Barners were allowed to use his car when they needed to. He testified that the defendant returned to the house on West Meadow Lane where they all lived "right after" 3 p.m. on August 3, 2018, and asked Hastings to wake him up after the defendant took "a quick nap before he went into work" at 4 p.m. He testified that he woke up the defendant at around 3:30 p.m., and that the defendant did not leave the house between 3 and when he left for work at "about 3:50." Hastings

15

testified that his mother—the defendant's grandmother—took the defendant to work because the black Chevrolet Cruze was not at the house. He testified that he later learned that Katera had borrowed the car for a quick errand. He testified that his mother called Hastings' sister, and borrowed her car to take the defendant to work, and that he saw them leave in his sister's car. He testified that he willingly later let the police search both his car and the house. On cross-examination, Hastings agreed that he did not tell the police about the defendant taking a nap on August 3, 2018, or about Katera taking Hastings' car while the defendant was napping. He testified that he did not tell the police these things because they did not ask about them.

¶ 33    Sharon Keene testified that she was the defendant's grandmother, and that on August 3, 2018, she lived in the house on West Meadow Lane with her husband, oldest son Sean, and the defendant. She testified that Katera stayed at the house at times as well. She testified that on August 3, 2018, between "2:35 to 3 o'clock," she took the defendant to Midwest Cash because he wanted to pawn some items to get money to go out that evening. She testified that it was an approximately "five, six minute" drive from the house to Midwest Cash. Keene testified that they left Midwest Cash "a little after three," because the defendant had to be at work at 4 p.m. She testified that after getting gas, they arrived back at home between 3:10 and 3:15 p.m. She testified consistently with Hastings with regard to the defendant taking a nap and her thereafter taking him to work. On cross-examination, she too agreed that she did not tell the police about Katera taking the car while the defendant was napping, but thereafter she testified that she did tell the police that the defendant took a nap prior to going to work that afternoon.

¶ 34    After Keene's testimony, the defense rested its case, with the defendant electing to exercise his right not to testify. The State presented the following evidence in rebuttal. Carbondale police detective Jennifer Brooke Lam identified Keene in court and testified that she spoke with Keene at the house on West Meadow Lane the day after the robbery and shooting. She testified that Keene

16

told her that it was Katera Barners who drove the defendant to work the previous day, and that Barners did so in the black Chevrolet Cruze. On cross-examination, Lam agreed that a Sergeant Wilson from the Carbondale Police Department had filed a report in which he indicated that Keene told him that she drove the defendant to work on August 3, 2018. Following Lam's rebuttal testimony, the State again rested, and a jury instruction conference followed.

¶ 35    With regard to the State's proposed jury instruction number 10, which tracked Illinois Pattern Jury Instructions, Criminal, No. 3.14, defense counsel stated that he was "all in favor of" this limiting instruction with regard to the defendant's rap music video, but that he believed that at the pretrial hearing on the potentially prejudicial nature of the video, the trial judge had ruled that the video was admissible only as to the issue of identification, whereas the State's proposed jury instruction stated that the jury could consider the video for "identification, presence, intent, design, and knowledge." Defense counsel indicated that his objection was to the inclusion of presence, intent, design, and knowledge. In support of his objection, he stated, "I think if you put intent, design, knowledge and presence in there, that really gets into the prejudicial nature of that video. That basically then you're letting the evidence come in not just for identification, but for, like, intent." He thereafter argued that allowing the State's proposed instruction would, in effect, amount to "crossing over into saying if you make a video, and you talk about things in a rap video, that that's your intent in the real world. We object to that."

¶ 36    In response, the State contended that there existed "a few different evidentiary matters that were brought to light regarding [the] defendant's other conduct," and that with regard to "the video, specifically, it's the [State's] position that certainly would—is relevant for purposes of identification, as well as intent, design and knowledge, in that he is talking about robbing people." The State added that "Miss Barners discussed the defendant possessing prescription pills." The State concluded that "[b]ased on all of that evidence, I think the issues of identification, presence,

17

intent, design and knowledge are certainly sort of intertwined and entangled with those evidentiary matters."

¶ 37    Defense counsel responded, "So if I understand the State's argument, they're saying it's just not the video, it's other things, like the arrangement to buy or sell drugs and other things." He added, "My objection was, you know, I'm trying to limit the effect of that video. I don't know that there is a way to do that with 3.14. I would still have an objection to presence, intent, design, and knowledge." The trial judge then ruled that he would give the instruction as proposed by the State, over the defendant's objection. He thereafter ruled that he would not give the defendant's proposed modified version of the instruction, which defense counsel described as 3.14 being modified "to just include identification." The defendant did not ask the trial judge to provide one instruction—such as his modified 3.14 instruction—to the jury with regard to the video, and to provide a separate instruction—such as the State's proposed instruction—to the jury with regard to other bad acts or other crimes evidence, such as the defendant allegedly possessing prescription pills.

¶ 38    After the trial judge admonished the jury to "[k]eep in mind that what attorneys say to you during their arguments is not evidence and should not be considered by you as evidence," the parties presented their closing arguments. The State mentioned the defendant's rap music video, but only in terms of it being the tool used by Kaufman to identify the defendant. The State did not ask the jury to consider the video for purposes of intent or anything else other than identification. The State also argued how the evidence showed that, based upon the relatively short distances between the scene of the shooting near Rebound, the house on West Meadow Lane that Barners testified she and the defendant returned to after the shooting, and the defendant's place of work, it was possible for the defendant to have been the assailant of Kaufman and still clock in at work at 4:08 p.m. The State argued that when considering the defendant's alibi, as provided by his

18

grandmother—Sharon Keene—and his uncle—Sean Hastings—the jury should consider their interest in trying to protect the defendant, to whom they were related and with whom they lived.

¶ 39    In an extensive closing argument, defense counsel argued, *inter alia*, that Kaufman's identification of the defendant as his assailant was "wrong" because it came after Kaufman viewed a rap music video full of references to guns and robberies, not after a proper police lineup that would not have shown such suggestive things. He argued that the jury should not "put any trust in" Kaufman's identification of the defendant, and should instead consider the fact that shortly after the shooting, Kaufman did not pick the defendant's photograph out of the lineup that was presented to Kaufman, even though the defendant's photograph was present there. He pointed to inconsistencies between Kaufman's testimony and the testimony of Detective Stewart with regard to how Kaufman came across the defendant's rap music video, which he suggested showed that Kaufman was overly influenced by the video after one of his friends suggested that he watch it, and that Kaufman was acting out of a "human need to identify who" robbed and shot him when he identified the defendant, from the video, as his assailant, rather than acting from an unbiased perspective. Defense counsel then argued that Kaufman "had some credibility problems, too," and pointed to the inconsistent accounts Kaufman gave to police when first describing why he was meeting with Barners on August 3, 2018, as well as when he told police that this was the first time he had purchased drugs from Barners. He further argued, *inter alia*, that Barners had many credibility issues as well, and had only implicated the defendant to avoid being charged as an adult herself. He contended that the defendant's alibi was believable, and made it impossible for the defendant to be the person who robbed and shot Kaufman, despite what unreliable witnesses such as Kaufman and Barners said.

19

¶ 40    Following closing arguments, the trial judge instructed the jury. Of relevance to this appeal, he instructed them, *inter alia*, as follows, pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.14:

> "Evidence has been received that the defendant has been involved in conduct other than that charged in the Information. The evidence has been received on the issues of the defendant's identification, presence, intent, design, and knowledge, and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct. And, if so, what weight should be given to this evidence on the issues of identification, presence, intent, design, and knowledge."

¶ 41    Following deliberations, the jury found the defendant guilty of both offenses with which he was charged: armed robbery and aggravated battery with a firearm. On May 16, 2019, the defendant filed a motion for, *inter alia*, a new trial. Therein, he claimed that, *inter alia*, the admission of the defendant's rap music video at his trial was unduly prejudicial and prevented him from getting a fair trial. He also raised a number of purported errors made by the trial judge when ruling on evidentiary matters, and contended that he was not proved guilty beyond a reasonable doubt.

¶ 42    On July 26, 2019, a hearing was held on the defendant's motion. Defense counsel reiterated the arguments he made in his written motion. Thereafter, the trial judge denied the motion. Immediately after that, the defendant's sentencing hearing was held. Kaufman's mother presented a victim impact statement. Defense counsel read a letter from a Reverend Darryl Cox in support of the rehabilitative potential of the defendant. The defendant's mother then testified with regard to the trauma the defendant had suffered during his childhood, including the murder of the defendant's father, and also testified in support of the rehabilitative potential of the defendant.

¶ 43    The State then presented its sentencing argument. As a factor in aggravation, the State argued that a strong sentence was "necessary to deter others from committing the same crime." The State continued as follows:

> "The defendant is well known within this community. He's somewhat of a local celebrity. His videos are on YouTube. The content of his art, as we've heard several times, is about robbing and shooting people. It's about promoting and glamorizing this lifestyle. And his videos reach a lot of people. There are a lot of views of his videos on YouTube. As stated, he is well known especially with teenagers and young adults within the area. And even Jordan had heard some of the defendant's recordings prior to this incident. *** A message also needs to be sent to all of these individuals that were depicted in these videos with the defendant that their actions have real life consequences and these are choices that they're making."

¶ 44    In response, defense counsel argued as follows:

> "We ask this Court also not to punish the defendant because of his rap music. That's not proper either. He has a rap music career. It's not unusual for young people to be involved in music, whatever genre it is. And each genre has its own particular styles and haircuts and outfits and things that go along with it. That's not something that this Court should consider in punishing him. He has a right to free speech. He has a right to express himself."

Defense counsel added that there was "no indication that any of that stuff is true in the video," as well as that "[t]here was no evidence that other people in the music video were involved in planning a robbery or committing a robbery or anything like that." He posited that, to the contrary, "[i]t was a group of young men attempting to be cool to their peer group and making up lyrics and singing songs in an attempt to become famous on YouTube, which is very common these days with the accessibility and distribution of media and creating art projects."

21

¶ 45    As part of his statement in allocution, the defendant stated as follows:

"I made music, but my music is not only about robbing and shooting people. I made two songs about that, and I changed my life since then. I made multiple songs about uplifting my community and my people and showing people that you can do something better with your life."

¶ 46    The trial judge thereafter stated that he had considered the defendant's presentence investigation report, the victim impact statement, the other evidence presented, and the arguments of the parties. He stated, *inter alia*, that the sentences he handed down would "be based in part on considering factors" argued in aggravation by the State, including the State's argument that a strong sentence was necessary to deter others from committing the same crime. He did not mention, at all, the defendant's rap music video or musical aspirations, either in terms of the State's argument that the video should be considered as part of the deterrence factor, or the defendant's argument that the video should not be considered at all. He sentenced the defendant to 14 years on the armed robbery conviction, plus the statutorily-required 20-year enhancement for discharging a firearm during the armed robbery, with the 34-year sentence to be served at 50%. He sentenced the defendant to 19 years on the aggravated battery with a firearm conviction, to be served concurrently with the first conviction, and at 85%. He sentenced the defendant to a term of mandatory supervised release following both sentences.

¶ 47    On August 22, 2019, the defendant filed a motion to, *inter alia*, reconsider sentence. Therein, he contended that the trial judge failed to properly consider the factors in mitigation, and that if the trial judge had considered them properly, a lesser sentence for the defendant would have been warranted. He contended that the defendant's sentences were excessive for other reasons as well. He did not claim that the trial judge gave improper consideration to a factor or factors in aggravation. Following a hearing on October 24, 2019, the defendant's motion was denied.

Thereafter, this timely appeal was filed, and the trial judge appointed the Office of the State Appellate Defender (OSAD) to represent the defendant on appeal. The defendant subsequently retained private counsel, who represents him before this court, and accordingly a motion to withdraw filed by OSAD was granted by this court. Additional facts will be presented as necessary throughout the remainder of this order.

¶ 48                                  II. ANALYSIS

¶ 49    On appeal, the defendant contends the trial judge erred when he (1) allowed the defendant's rap music video to be admitted into evidence and shown to the jury, because "it was overly prejudicial and denied [the] defendant a fair trial"; (2) allowed the State's proposed jury instruction number 10, because "it allowed the jury to consider the video evidence beyond the limited purpose of identification, thus denying the defendant a fair trial"; and (3) "considered [the] defendant's rap music during sentencing, as the defendant's art medium is not relevant in being necessary to deter others from committing the same type of offense." The defendant does not challenge the sufficiency of the evidence adduced at his trial to sustain his convictions, either with regard to his conviction for armed robbery or with regard to his conviction for aggravated battery with a firearm.

¶ 50    We begin with the defendant's first contention of error. In support of his contention, the defendant notes precedent from this court to the effect that when weighing the probative value of evidence against the prejudice likely to arise from the admission of that evidence, trial judges must consider whether the evidence in question could be replaced by other, less prejudicial evidence. He argues that in this case, the trial judge abused his discretion by allowing the video to be admitted into evidence and shown to the jury, because the State could have achieved its goal of presenting identification evidence of the defendant by presenting only the still frame photograph from the video, which was also entered into evidence, as People's Exhibit Number 9-A. He also argues that because generalized threats offer little probative value, but can arouse prejudice or hostility in a

23

jury, the rap music video should not have been played for the jury in its entirety. As part of his overall argument with regard to his first contention of error, the defendant notes that the jury was "not instructed to only consider the video for the purpose of identification," even though the trial judge allowed the video to be admitted only for purposes of identification. The defendant points to precedent from the New Jersey Supreme Court that prevented rap lyrics from being admitted into evidence, because of the danger of unfair prejudice based on stereotypes related to rap music and violence. He reiterates his argument that rather than showing jurors "the complete, prejudicial video, the State could and should have relied on the still photos taken from the video," and posits that there was no need to show the entire video simply because the video was related to the police investigation, and was related to how the police came to identify the defendant as a suspect in this case. With regard to the State using the video as a means to explain how and why Kaufman could identify the defendant from the video but not from the lineup photograph he was shown at the hospital, the defendant notes that, at trial, Kaufman actually compared the still frame photograph from the video to the lineup photograph and pointed out differences, which the defendant argues is further proof that the jury did not need to see the entire video to understand the differences Kaufman was talking about.

¶ 51    The State responds that the defendant's "rap video was relevant for many purposes," in part because "it depicted the means by which Kaufman identified the defendant as the man who robbed and shot him on August 3, 2018," but also "to demonstrate the investigatory steps taken by law enforcement in this case," and "to show motive, intent, [and] absence of mistake" because "the music and lyrics were related to the crime charged." The State posits that the video was not more prejudicial than probative, because the video's "lyrics were not transcribed and in light of the evidence the jury heard, any vulgarity in the video[ ] likely did not carry a prejudicial impact." The State adds that because the "video was not translated by an expert for the jury, and no questions

were asked about [the meaning of the video]," the claim of prejudice is "speculative and unavailing." The State further contends that the limiting instruction that was given to the jury was sufficient to prevent unfair prejudice to the defendant, and to prevent the jury from considering the video to show that the defendant had a propensity to commit the charged crimes. The State also argues that even if it was error to admit the video, it was harmless error in light of what the State claims was overwhelming evidence of the defendant's guilt in this case. In reply, the defendant reiterates his argument that rather than showing jurors the entire video, the State could and should have relied on the still photos taken from the video, and argues that a harmless error analysis should not apply in this case because, *inter alia*, the evidence of the defendant's guilt was not overwhelming.

¶ 52    As both parties agree, in Illinois, a trial judge's decision on a motion *in limine* will not be reversed by this court unless the decision represents a clear abuse of discretion. *People v. Gliniewicz*, 2018 IL App (2d) 170490, ¶ 32. A clear abuse of discretion occurs where a decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial judge. *Id*. In this case, it is true that at one point during his testimony, Kaufman—presumably to explain why he could identify the defendant from the video but not from the photograph he was shown at the hospital—compared the still frame photograph exhibit from the video to the lineup photograph exhibit and pointed out differences. Although the defendant argues this is proof that the jury did not need to see the entire video to understand the differences Kaufman was talking about, the defendant's argument overlooks the fact that Kaufman also testified that upon watching the video at home, he "[a]lmost immediately" recognized the man as the person who shot him, based on the man's "eye shape and his long dreads," which was consistent with the State's pretrial argument, in support of its motion *in limine*, that "a picture is just a picture," which "depicts a person in one particular way," leaving "no way to determine that person's mannerisms

25

or perhaps other distinguishing characteristics about an individual," whereas "[a] video is a little different," because "a person or a viewer is able to see a little bit more about a person rather than just one, you know, snap, snap picture."

¶ 53    In light of the arguments made by both parties with regard to the relevance and probative value of the rap music video, as well as its potential for unfair prejudice—and in light of the fact that it is undisputed by the parties that the identity of the person who robbed and shot Kaufman was the key fact in dispute at the trial—we believe a reasonable trial judge could have concluded that it was appropriate to allow the jury to view the video, so that the jury members could decide for themselves whether Kaufman's explanation for his failure to pick the defendant out of the photo lineup was credible. We note that in so doing, a reasonable trial judge could have believed that the jury members might conclude, in light of their observation of the defendant in the courtroom during the course of the trial, that the gestures and facial expressions depicted in the moving images in the video did *not* make the identification of the defendant any more clear or likely than did the lineup photograph, a conclusion that would have undermined the credibility of Kaufman—and, in fact, undermined the State's entire theory of the case—and instead would have bolstered the defendant's theory that (1) the reason Kaufman did not pick the defendant out of the photo lineup shortly after the robbery and shooting was because the defendant was not the person who robbed and shot Kaufman, and (2) Kaufman's identification of the defendant from the video resulted from Kaufman being unduly influenced by the fact that in the video the defendant rapped about robbing and shooting people, even though in reality the defendant never engaged in such acts. Accordingly, we conclude that the decision made by the trial judge with regard to the State's motion *in limine* was not arbitrary, fanciful, or unreasonable, and was not a decision no reasonable person would make. See *id.* We therefore conclude that there was no clear abuse of discretion by the trial judge in this case. See *id.*

¶ 54    We turn next to the defendant's second argument on appeal, which is that the trial judge erred when he allowed the State's proposed jury instruction number 10, because "it allowed the jury to consider the video evidence beyond the limited purpose of identification, thus denying the defendant a fair trial." In support of this argument, the defendant contends that because the video was admitted only for purposes of identification, the jury should have been instructed to that effect, despite the State's argument at the jury instruction conference that the video was also relevant with regard to intent, knowledge, and design. The defendant points to the general proposition of law that when evidence is admitted for a particular purpose and is inadmissible for another purpose, the party against whom it is admitted may tender instructions appropriately limiting the purpose for which it may be considered. The defendant contends that in this case, defense counsel did just that, objecting to the State's proposed jury instruction number 10—which, as explained above, tracked Illinois Pattern Jury Instructions, Criminal, No. 3.14, and stated that the jury could consider the evidence for "identification, presence, intent, design, and knowledge"—and instead proposing a modified version of 3.14 that defense counsel described as being designed "to just include identification," which the defendant on appeal contends "would have been a precisely-tailored version of Illinois Pattern Jury Instructions-Criminal 3.14." The State argues that the instruction given to the jury was proper, because it covered not only the video but also the other evidence of bad acts or other crimes that was presented at trial.

¶ 55    The principal problem with the defendant's argument is that it fails to consider adequately the context in which the trial judge made the decision to give the State's proposed instruction and to reject the defendant's proposed instruction. As explained above, at the jury instruction conference, with regard to the State's proposed jury instruction number 10, defense counsel stated that he was "all in favor of" this limiting instruction with regard to the defendant's rap music video, but that he believed that at the pretrial hearing on the potentially prejudicial nature of the video,

the trial judge had ruled that the video was admissible only as to the issue of identification, whereas the State's proposed jury instruction stated that the jury could consider the video for "identification, presence, intent, design, and knowledge." Defense counsel indicated that his objection was to the inclusion of presence, intent, design, and knowledge. In support of his objection, he stated, "I think if you put intent, design, knowledge and presence in there, that really gets into the prejudicial nature of that video. That basically then you're letting the evidence come in not just for identification, but for, like, intent." He thereafter argued that allowing the State's proposed instruction would, in effect, amount to "crossing over into saying if you make a video, and you talk about things in a rap video, that that's your intent in the real world. We object to that."

¶ 56 In response, the State contended that there existed "a few different evidentiary matters that were brought to light regarding defendant's other conduct," and that with regard to "the video, specifically, it's the [State's] position that certainly would—is relevant for purposes of identification, as well as intent, design and knowledge, in that he is talking about robbing people." The State added that "Miss Barners discussed the defendant possessing prescription pills." The State concluded that "[b]ased on all of that evidence, I think the issues of identification, presence, intent, design and knowledge are certainly sort of intertwined and entangled with those evidentiary matters."

¶ 57 Defense counsel responded, "So if I understand the State's argument, they're saying it's just not the video, it's other things, like the arrangement to buy or sell drugs and other things." He added, "My objection was, you know, I'm trying to limit the effect of that video. I don't know that there is a way to do that with 3.14. I would still have an objection to presence, intent, design, and knowledge." The trial judge then ruled that he would give the instruction as proposed by the State, over the defendant's objection. He thereafter ruled that he would not give the defendant's proposed

28

modified version of the instruction, which defense counsel described as 3.14 being modified "to just include identification."

¶ 58    It is within this context that the defendant's argument on appeal must be viewed. Thus, although the defendant is correct that when evidence is admitted for a particular purpose and is inadmissible for another purpose, the party against whom it is admitted may tender instructions appropriately limiting the purpose for which it may be considered, the defendant is incorrect in his assertion that in this case, defense counsel did just that. To the contrary, after the State made it clear that the State believed its 3.14 instruction was appropriate because there was other bad acts and other crimes evidence in addition to the defendant's rap music video, the defendant did not ask the trial judge to provide one instruction—such as his modified 3.14 instruction—to the jury with regard to the video, and to provide a separate instruction—such as the State's proposed instruction—to the jury with regard to other bad acts or other crimes evidence. Instead, defense counsel simply stated, "My objection was, you know, I'm trying to limit the effect of that video. I don't know that there is a way to do that with 3.14. I would still have an objection to presence, intent, design, and knowledge."

¶ 59    Defense counsel's assertion that he did not believe the State's proposed instruction— which, in light of the other bad acts and other crimes evidence adduced at trial, the State had every right to request—could "limit the effect of that video" is not the equivalent of proposing that a separate, properly-limited instruction be given with regard to the video. Instead, defense counsel persisted in offering an instruction that was limited entirely to identification, without ever arguing how his proposed instruction would be sufficient in light of the State's argument about additional bad acts and other crimes evidence the jury had heard. Indeed, the modified version of 3.14 offered by defense counsel was not tailored specifically to the video at all: like the State's instruction, it began by stating the following: "Evidence has been received that the defendant has been involved

29

in conduct other than that charged in the information." The defendant's proposed instruction then told the jury that (1) "This evidence has been received on the issue of the defendant's identification and may be considered by you only for that limited purpose," and (2) "It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issue of identity." Clearly, by offering this modified instruction, defense counsel chose to take an all-or-nothing approach to the question of an instruction on other crimes and bad acts evidence in this case, without ever attempting to explain to the trial judge how that approach was compatible with all of the bad acts and other crimes evidence heard by the jury, rather than with only the evidence related to the video.

¶ 60    On appeal, the defendant has not put forward any argument with regard to defense counsel's performance with regard to this point. Accordingly, the defendant has forfeited, in this direct appeal, consideration of such a claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Moreover, the defendant has put forward no argument suggesting a *sua sponte* duty on the part of the trial judge to craft instructions other than those offered by the parties, and accordingly has forfeited, in this direct appeal, consideration of any argument to that effect as well. See *id*. Under these circumstances, where there was no request by defense counsel for a jury instruction that was specifically tailored to only the video and only the issue of identification, we conclude that the trial judge did not err by giving an instruction that covered all of the other crimes and bad acts evidence together, as proposed by the State. We note as well the general rule of law, not addressed at all by the defendant in his briefs in this appeal, that when members of a jury receive a limiting instruction that allows them to consider evidence for a number of reasons, the inclusion of one proper reason—in this case, identification—

30

compels us to affirm a defendant's convictions, even if other reasons were included in the limiting instruction that were not proper. See, *e.g.*, *People v. Spyres*, 359 Ill. App. 3d 1108, 1115 (2005). Finally, we also note that when a trial judge rules prior to trial on a motion *in limine*, that ruling is always subject to reconsideration by the trial judge during the trial, and accordingly the trial judge's final ruling always takes place at trial, not before. See, *e.g.*, *People v. Drum*, 321 Ill. App. 3d 1005, 1008 (2001). Thus, as the State insinuates in its brief on appeal, it is possible that the trial judge determined during the trial that the video was admissible for purposes other than just the identification of the defendant, in which case the State's proposed jury instruction would not have been errant at all. The defendant, in his opening brief on appeal, has put forward no argument to the effect that such a determination by the trial judge during the course of the trial would have been in error, and accordingly has forfeited, in this direct appeal, consideration of any such contention. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing).

¶ 61 We turn now to the defendant's third and final argument on appeal, which is that the trial judge erred when he "considered [the] defendant's rap music during sentencing, as the defendant's art medium is not relevant in being necessary to deter others from committing the same type of offense." In support of this argument, the defendant correctly points out that at the sentencing hearing, the State argued that, in the context of this case, deterrence as a factor in aggravation should be tied to the fact that (1) the defendant was "well known within this community," and "somewhat of a local celebrity," (2) "[t]he content of his art" was "about robbing and shooting people" and "about promoting and glamorizing this lifestyle," and (3) "[a] message" could be sent to others that "actions have real life consequences." The State responds by arguing that the

defendant's contention is positively rebutted by the record in this case, because "a review of the record demonstrates that the trial [judge] did not consider [the] defendant's rap music at sentencing." The State argues that in fact, the trial judge "made no reference whatsoever to [the] defendant's rap music when imposing a sentence."

¶ 62　It is true that a trial judge may not consider an improper factor when sentencing a defendant. See, *e.g.*, *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). "Consideration of an improper factor in aggravation clearly affects the defendant's fundamental right to liberty, and a court of review must remand such a cause for resentencing, except in circumstances where the factor is an insignificant element of the defendant's sentence." (Internal quotation marks omitted.) *Id*. To determine the correctness of a defendant's sentence, this court will "not focus on a few words or statements made by the trial" judge, but instead will "consider the record as a whole" when making our determination. (Internal quotation marks omitted.) *Id*. "To obtain a remand for resentencing, therefore, [a] defendant must show more than the mere mentioning of an improper fact," because "[a]n isolated remark made in passing, even though improper, does not necessarily require that [a] defendant be resentenced" (internal quotation marks omitted). *Id*. Instead, a "defendant must show that the trial court relied on the improper fact when imposing sentence." *Id*.

¶ 63　In this case, we agree with the State that there is no factual support for the defendant's contention on appeal, and therefore that contention fails. As described above, at the sentencing hearing, the State argued, as a factor in aggravation, that a strong sentence was "necessary to deter others from committing the same crime." The State continued as follows:

> "The defendant is well known within this community. He's somewhat of a local celebrity. His videos are on YouTube. The content of his art, as we've heard several times, is about robbing and shooting people. It's about promoting and glamorizing this lifestyle. And his videos reach a lot of people. There are a lot of views of his videos on YouTube. As stated,

he is well known especially with teenagers and young adults within the area. And even Jordan had heard some of the defendant's recordings prior to this incident. \*\*\* A message also needs to be sent to all of these individuals that were depicted in these videos with the defendant that their actions have real life consequences and these are choices that they're making."

¶ 64 Just prior to announcing his sentence, the trial judge stated that he had considered the defendant's presentence investigation report, the victim impact statement, the other evidence presented, and the arguments of the parties. He stated, *inter alia*, that the sentences he handed down would "be based in part on considering factors" argued in aggravation by the State, including the State's argument that a strong sentence was necessary to deter others from committing the same crime. However, he did not mention, at all, the defendant's rap music video or musical aspirations, either in terms of the State's argument that the video should be considered as part of the deterrence factor, or the defendant's argument that the video should not be considered at all.

¶ 65 Thus, not only is there no factual support for the argument that the trial judge *relied upon* an improper factor when sentencing the defendant in this case, but there also is not any factual support for the argument that the trial judge, rather than the State, even *mentioned* an improper factor. To the contrary, the trial judge stated only that he would consider deterrence as a factor in aggravation, not that he would consider the defendant's choice of artistic medium, or the defendant's "local celebrity" status, when weighing deterrence as a factor. Accordingly, the defendant has not shown any error by the trial judge when sentencing the defendant. See, *e.g.*, *Reed*, 376 Ill. App. 3d at 128. Moreover, the defendant has presented no argument that when the record is considered as a whole, the defendant's sentence is not an appropriate one. See *id*. Accordingly, the defendant has forfeited, in this direct appeal, consideration of such a claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant,

33

the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing).

¶ 66                                    III. CONCLUSION

¶ 67    For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 68    Affirmed.