2024 IL App (1st) 230520

FIRST DISTRICT
SECOND DIVISION
November 6, 2024

No. 1-23-0520

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18CR17744 |
| | ) | |
| KAHLIL COLONE, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment and opinion.

## OPINION

¶ 1 Following a jury trial, defendant Kahlil Colone was convicted of two counts of first degree murder and was subsequently sentenced to an aggregate sentence of 50 years in prison. On appeal, defendant argues that (1) the trial court erred in allowing the State to introduce a rap video created by defendant approximately two months after the homicides, (2) trial counsel was ineffective for failing to object to the unauthenticated and inaccurate transcription added by the State to the rap video, (3) the trial court erred in allowing the State to introduce multiple photos of the deceased victims, and (4) defendant's *de facto* life sentence should be vacated because the State presented his disciplinary records from the juvenile temporary detention center (JTDC) without a live witness and the trial court relied on improper evidence as aggravating factors.

¶ 2 Defendant and his codefendant Leslie Ward were charged by indictment with multiple counts of first degree murder stemming from the August 17, 2018, shooting deaths of Darnell

Flowers and Raysuan Turner. Upon his convictions, the trial court subsequently sentenced defendant to consecutive terms of 25 years for each homicide, for a total term of 50 years in prison. Defendant and Ward were tried in simultaneous but severed jury trials.

¶ 3     Prior to trial, defendant filed a motion *in limine* to bar the State's use of a rap video created by defendant, arguing that the video lacked probative value and was prejudicial to defendant. According to defendant, nothing in the video or its lyrics related directly to the commission of a murder nor implied or related to the case at issue. Also, the video did not indicate on what date it had been created, including whether it was created after the murders in this case. After considering the parties' arguments, the trial court denied the motion.

¶ 4     The following evidence was presented at defendant's November 2022 jury trial.

¶ 5     Melanie Reneau testified that she was the mother of Flowers. Flowers was 17 years old in August 2018 and was a student at Fenger Academy. On August 17, 2018, Reneau saw Flowers at home that morning. The last time she saw him, he told her he was going to his girlfriend's house. When Flowers had not returned home by 9 p.m., Reneau called the police station to report him missing. The following morning, she went to the police station and filed a missing person report. She was able to track Flowers's cell phone to a location near East 130th Street and South Eberhart Avenue in Chicago. She identified Flowers when he was alive in a photograph. The parties then stipulated to a photograph of Flowers taken after he was deceased.

¶ 6     Rayniecia Morris testified that she was the mother of Turner. He was 16 years old in August 2018 and would have been a junior at Fenger Academy. Morris last saw Turner around 1 p.m. on August 17, 2018. He told her he was going to his father's house. Later that night she texted Turner to make sure he was home and did not get a response. When she arrived home around 11 p.m., Turner was not home. She called his father and was told that Turner was not

with his father. Morris then called the police station to see if any teenagers were in custody but was told there were not.

¶ 7    The next day, August 18, 2018, Morris went to work and then at 1 p.m., she left work to go to the police station. There, she filed a missing person's report. She also went door to door around the neighborhood passing out missing person fliers. Morris "stopped everybody" she saw on the street in the area around Golden Gate Park in Chicago. One of the people she stopped was defendant. She identified him in court as the young man with a blue shirt and dreadlocks. Morris spoke with defendant near East 132nd Street and South Forestville Avenue. Defendant was shown a picture of Turner, and he initially responded that he did not know Turner, but when pressed by Morris, defendant told her that he had not seen Turner that day. Defendant told her that he had seen Turner at the park the previous day, August 17, 2018. She also spoke with an individual with the nickname "Squeezy," near East 133rd Street and South Eberhart Avenue, and identified him in court as codefendant Ward. Morris had not known either of the defendants before that day.

¶ 8    While Morris was at the police station around 10 a.m. on August 19, 2018, she received an anonymous phone call. After that call, she went to Golden Gate Park near a bus stop to look for her son, but she did not locate him. As she was on the way to the police station, Morris received another phone call that caused her to return to the park. Morris later received another phone call from a detective informing her that the bodies of Turner and Flowers had been found in a wooded area behind a store called Rosebud Farms. The following day, August 20, 2018, Morris went to the Cook County Medical Examiner's Office, identified her son's body, and retrieved some personal items, including Turner's cell phone. She gave the personal items to Sergeant John Foster.

¶ 9 In October 2018, some students from Fenger Academy called Morris to tell her that there was a Facebook Live video on "BG Shooter's" Facebook page. Morris knew that "BG Shooter" was the name of defendant's Facebook page. She explained that a Facebook Live video was a livestream that could be played on a person's Facebook page for up to 24 hours. Morris watched the video, recorded it from her screen, and sent it to Sergeant Foster.

¶ 10 Detective Matthew Micetich testified that in August 2018 he served in the special victims unit and was assigned to investigate two missing people with his partner Detective Henry Thomas. He assisted in generating the missing persons' fliers for two male juveniles. Family members of the missing persons assisted the police by notifying them that a cell phone was "pinging" near East 130th Street and South Ellis Avenue, which was also close to Golden Gate Park. Detective Micetich described a wooded area near the park as a "very dense" area behind some houses. He went to this location with Detective Thomas and Detective Livingstone close to midnight on August 19, 2018. The detectives used flashlights to aid their vision. When they entered the wooded area, the detectives discovered two bodies. Detective Micetich discovered one body approximately 20 to 25 feet to his left as he entered an opening into the wooded area. He "thought" this person was wearing "camouflage pants and maybe a black hoodie." Detective Thomas found the second body approximately 15 feet away. That person was wearing light blue or gray jeans and a black hoodie. Both individuals were deceased, and some decomposition had begun. The detectives notified the violent crimes team. Detective Micetich had no additional involvement in the case.

¶ 11 Victoria Hutchens, who was in custody at the Cook County jail because she failed to appear to testify earlier as a witness pursuant to subpoena, also testified at trial. She was 16 years

old and lived near East 131st Street and South Forestville Avenue in August 2018. Golden Gate Park was a couple of blocks away from her home.

¶ 12    On August 17, 2018, Hutchens was with her friend Heaven Johnson, who lived across the street from the park, and another young girl, Hutchens's cousin. The three girls went to the park and saw defendant, "Squeezy," and two other boys. She identified defendant in court as wearing a blue shirt and tie with long dreadlocks and identified "Squeezy" in court as Ward. She did not know the other two boys. Hutchens had known Ward for three years and defendant for a couple of months. She met defendant through Johnson. According to Hutchens, defendant was around the neighborhood and with Ward a lot. She saw the boys near the benches by the playground area in the park.

¶ 13    The group then left the park to go towards Smiley's, a convenience store. While they were walking to the store, defendant said to Hutchens and Johnson, "someone was gonna die today." She and Johnson then went into the store while the four boys "took off into the woods." Hutchens saw all four boys go into the woods. She did not see the two boys who entered the woods with defendant and Ward exit the woods. She admitted that she could not see if anyone left the woods while she was in the store. After Hutchens left the store, she went near the basketball court at the park. Defendant came out of the woods alone and approached her and Johnson. He asked her to hold his and Ward's cell phones. Defendant then returned to the woods. Hutchens then heard four gunshots. The three girls then ran to Johnson's house. She and Johnson went inside while Hutchens's cousin stayed outside.

¶ 14    They stayed inside watching television for a while and then went into Johnson's backyard. At some point, Ward came to the backyard and collected the cell phones. He told them he wanted to talk to them but did not want to talk in front of Hutchens's cousin. The next day,

5

August 18, 2018, defendant contacted Hutchens through Facebook and asked her and Johnson to come talk to him at Ward's house. When the girls arrived at Ward's house, defendant was outside of the house and Ward was inside. Ward "stuck his head out" of the window to talk. Defendant and Ward asked the girls if they were okay. Defendant and Ward then told the girls that they were not outside that day, did not see them, and did not hear anything. Hutchens understood defendant to mean that on the day of the shooting, she did not see them going into the woods.

¶ 15    On August 20, 2018, Lieutenant Patrick Kinney and Sergeant Foster came to Hutchens's house, and she recounted what she had seen and heard on August 17, 2018, involving defendant, Ward, and the two boys. Hutchens admitted that she did not tell the officers that defendant told her that someone was going to die. Later in September 2018, Hutchens met with detectives and viewed two photo arrays. In the first photo array, Hutchens identified Ward from a group of six pictures, and in the second, she identified defendant from the group of six pictures. She then met with an assistant state's attorney (ASA) and testified before the grand jury about the events surrounding the shooting. Hutchens admitted that she did not see defendant with a gun, she never called police, and she was scared to be involved in the case.

¶ 16    Paul Presnell, a forensic investigator for the Chicago Police Department, testified that he was assigned to process the scene the night of August 19, 2018. He entered the wooded area and observed two deceased males. He photographed the bodies and the surrounding area. The crime scene photographs were admitted without objection. Presnell described the photographs showing the victims in a state of decomposition including the presence of maggots. He estimated the bodies were between 15 to 20 feet apart.

¶ 17    Presnell also looked for shell casings or other items of evidentiary value for approximately 4½ hours. He first used a metal detector, then a hard rake, and then a soft rake to locate any firearms evidence, such as fired bullets or cartridge cases. No shell casings were found. Presnell explained that a semiautomatic firearm will eject casings off the side of the barrel, but the casings remain in a revolver and have to be unloaded once fired.

¶ 18    The parties stipulated that in August 2018, Facebook received search warrants for four accounts. The information provided from Facebook disclosed the following: an account with the username BG Shoota belonged to defendant, an account with the username BG Choppa belonged to Ward, an account with the username BG Herbo belonged to Turner, and an account with the username BG Bibby belonged to Flowers.

¶ 19    Lieutenant Kinney testified that in August 2018, he was working as a homicide detective in Area 2 for the Chicago Police Department. He and his partner, Detective James Looney, were assigned to investigate the shooting deaths of Turner and Flowers shortly after midnight on August 20, 2018. They went to the area near East 130th Street and South Rhodes Avenue in Chicago. He observed several police cars, police officers, and crime scene tape cordoning off an area. The area was residential with a lot of trees and overgrown bushes between 130th Street and 131st Street. Lieutenant Kinney was directed to the center of the wooded area and while using his flashlight, he discovered the two deceased victims. Both victims were facedown and "extremely decomposed." Lieutenant Kinney was the lead investigator and had several other detectives assisting him, including some officers doing a canvass of the neighborhood to locate anyone that had seen or heard anything.

¶ 20    Lieutenant Kinney learned the possible identities of the victims as Flowers and Turner from Detective Micetich and his partner. Based on information obtained from an assisting

detective, Lieutenant Kinney was informed of a potential witness and the physical description and names or nicknames of the offenders. After a search was conducted of the police database, officers were looking for defendant and codefendant Ward. Lieutenant Kinney identified defendant in court as wearing a blue shirt and Ward was identified as wearing a brown shirt.

¶ 21    In his investigation, Lieutenant Kinney listened to 911 calls from residents that reported hearing multiple gunshots coming from the wooded area near East 130th Street and South Rhodes Avenue around 5:54 p.m. on August 17, 2018.

¶ 22    Lieutenant Kinney, along with Sergeant Foster, conducted an interview with Hutchens around 12:20 p.m. on August 20, 2018. She told him that she had seen four people go into the woods, but only two individuals came out. She provided him with the names for defendant and Ward, but she did not know the other two people. Defendant and Ward were arrested on August 20, 2018, but not charged at that time.

¶ 23    During his investigation, Lieutenant Kinney learned some information about the Facebook accounts for both defendants. While in custody on August 20, 2018, defendant told the lieutenant that he had a Facebook account under the name "BG Shoota." Ward also admitted to having an account under the name "BG Choppa."

¶ 24    Lieutenant Kinney recovered Flowers's cell phone before his body was taken to the morgue. When he turned on the cell phone, he discovered several conversations on Flowers's Facebook Messenger application from August 17, 2018, the day the officers determined he was murdered. These conversations were with both defendants. Flowers's Facebook account was under the name "BG Bibby." Lieutenant Kinney was able to determine that Turner's Facebook account was under the name "BG Herbo." He prepared and served search warrants for those accounts on Facebook. He then reviewed the account information received from Facebook. He

initially sent a preservation request to Facebook through a portal for law enforcement that would "freeze" the account to prevent information from being deleted. He requested information from August 10, 2018, through August 21, 2018. He detailed different conversations between the defendants and the victims. The State presented the conversations in PowerPoint slides through Lieutenant Kinney's testimony.

¶ 25    The PowerPoint slides showed the following messages. In an August 11, 2018 message, Flowers asked defendant, "Wssp w/ the pipes?" and defendant responded, "Everything still everything bro it's just mfers done started this dumb ass war so everybody in the field except u nd herbo." Lieutenant Kinney testified that based on his training and experience, he understood "pipes" to be a term that described firearms or guns. Another message asking about "the pipes" was sent from Flowers to Ward on August 11, 2018, and Ward responded, "Its war rn but i told u yucky all shoota[.]"

¶ 26    Later, on August 11, 2018, defendant sent a message to Flowers, "It's w.e y'all just can't get bumped every pole is needed" and Flowers responded, "Im already knowin." Lieutenant Kinney explained that, based on his experience and training, he understood "pole" also as a reference to a firearm or a gun.

¶ 27    At approximately 12:14 p.m. on August 17, 2018, Flowers sent a message to defendant and asked, "Wtw we fenna slide out there today." Defendant answered, "Idm I'm finna slide out thea rn I'm finna call my p.o.s. and put these shoes on," Flowers responded, "Bet im waitin on herbo[.]" Herbo refers to Turner. Flowers then asked, "Where yall fenna be at[?]" Around 2:30 p.m., Flowers sent a message to defendant, "We at the park[.]" Flowers also sent a message to Ward around 12:50 p.m. on August 17, 2018, "Me & herbo fenna slide out there" and later around 1:40 p.m., he asked Ward where they were going to be.

¶ 28    Lieutenant Kinney found these conversations to be significant because Flowers was asking both of the defendants individually where they were going to be and informing them that he and Turner would be coming. Lieutenant Kinney also pointed to the record of a 22-second phone conversation, and while there was no content to that call, it showed Flowers communicating with Ward prior to the murders. At approximately 5:38 p.m., Ward sent a message, "Hml wen u get to the slot." Lieutenant Kinney found this relevant because the murders occurred between 5:30 p.m. and 6 p.m.

¶ 29    Later that night, at approximately 8:17 p.m., defendant sent a message to Flowers, "Bro my bad I been sick asf all day i stayed in one spot nd laided it down[.]" Lieutenant Kinney testified that this message was sent after he had determined that the murders had occurred and the message was not included in defendant's account, which indicated that defendant had deleted this message. Flowers was already dead at that time, so he could not have deleted it.

¶ 30    The following day, on August 18, 2018, both defendants sent messages to Flowers's account. Defendant sent his first at approximately 4:23 p.m., "Were tf u at bro u still wit raysuan everybody looking for yall[.]" The other three messages were sent at approximately 7:25 p.m., "Wya bro", "Yo ppls looking for you y'all ass tweaking were tf y'all at", and "Bro stop playing you trippin wea tf y'all at[.]" Defendant also sent three messages to Turner at approximately 7:25 p.m. August 18, 2018, asking where he was, "Bro wya", "You still with bibby y'all ass off y'all s*** y'all got mfers worried were tf you at", and "Bro call me soon as u see this[.]"

¶ 31    Ward sent messages to Flowers at approximately 5:51 p.m. on August 18, 2018, "Aye bro wya yo ppls looking fa u" and later at 7:18 p.m., "Wyaa[.]" He also sent messages to Turner at the same times, "Wya yo ppls lookin fa u" and "Ayee bro wea you at[.]" Lieutenant Kinney found the space of approximately 24 hours relevant because the families had begun

"extensively" looking for Flowers and Turner. He also explained that "wya" means "where you at." Defendant continued to send messages to Turner on August 19, 2018, asking where he was.

¶ 32    The Facebook messages recovered from defendant's account included messages between defendant and Ward. At around 10 a.m. on August 17, 2018, Ward asked defendant, "Wya" and defendant answered, "I changed my clothes broski i got sum bread." Lieutenant Kinney understood "bread" to mean money. Ward then said, "Huryy up get out hea" and defendant responded, "lte check I'm omw Imma tell u." Lieutenant Kinney understood "omw" to mean "on my way." He also noted that defendant's message indicating that he was on his way was counter to defendant's message to Flowers that he was too sick to leave the house.

¶ 33    Lieutenant Kinney also discussed messages sent between Ward and someone from the account named "Migooboy Jordan" from August 17, 2018, in which Jordan said he had a "357" and Ward responded, "Yea I a trade. A 9 fa dat nd 250." Lieutenant Kinney testified that this was referencing firearms, a .357-caliber firearm and a 9-millimeter. He understood that Ward offered to trade the 9-millimeter and $250 for the .357-caliber firearm. Lieutenant Kinney testified that the weapon used in the shooting of Flowers and Turner "was a .357 caliber firearm." In his experiences, typically a .357-caliber firearm is a revolver and it does not leave shell casings.

¶ 34    Lieutenant Kinney also testified about a video defendant made of himself on Facebook Live. He explained that a Facebook Live video is streamed live but "[u]sually it's gone after 24 hours unless the accountholder decides to permanently post it on their Facebook page." Defendant's video was provided by the mother of one of the victims to Sergeant Foster. At the time that Lieutenant Kinney viewed this video, the investigation was still ongoing. He characterized the video as defendant performing a rap song. He identified a DVD of the video as well as second DVD of the video prepared by the State. He indicated that the only difference

11

between the two versions was that the State's version had a transcription of what defendant was saying. The State then asked to admit its version with the transcription, which the court allowed over defendant's previous objection. The video is just over a minute in length, which we discuss more fully below. Lieutenant Kinney testified on cross-examination that he believed that defendant was talking about a crime in the video. He admitted that defendant did not say that he shot or harmed anyone or committed a crime in the rap video.

¶ 35     Lieutenant Kinney also admitted that during his August 2018 interview with Hutchens, she did not tell him several things that she recounted in her trial testimony. According to the detective, Hutchens never told him that defendant said to her that someone was going to die that day, that she spoke with defendant and Ward the next day, that defendant told her not to say he had been outside that day, and that the two cell phones defendant asked her to hold belonged to defendant and Ward.

¶ 36     Dr. Ponni Arunkumar, the chief medical examiner for the Cook County Medical Examiner's Office, testified as an expert in forensic pathology. The autopsies for both Turner and Flowers had been performed by Dr. Myra Khan on August 20, 2018. He reviewed the autopsy reports for both victims. Photographs from both autopsies were admitted without objection.

¶ 37     The autopsy for Turner indicated that he was clothed in a black hoodie and blue and white jeans. There was evidence of decomposition, including "maggot activity, skin slippage, discoloration of the skin." The evidence of injury included two gunshot wounds. The first gunshot wound was to the back and was lodged in his left chest. The bullet was recovered. The path of the bullet went through the spinal cord, the left atrium of the heart, and the upper lobe of the left lung. The second gunshot wound was also in the back and injured the left abdomen,

including the spleen and the diaphragm, and then exited from the front of the abdomen. Neither gunshot wound showed evidence of close-range firing. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 38    The autopsy for Flowers detailed that he was wearing a red hoodie and camouflage pants. His body also showed evidence of decomposition, including maggots, bloating in the abdomen and head, and skin slippage. The body had two gunshot wounds. The first gunshot wound was the back of the head and the bullet lodged in the right facial area. The bullet was recovered. The gunshot went through the brain, but it was difficult to state which structures of the brain were injured due to decomposition. The second gunshot wound was to the left shoulder and injured the vertebra in the neck. The bullet exited from the right side of the face. The exit wound was large due to maggot activity. There was no evidence of close-range firing. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 39    The parties stipulated that a proper chain of custody for the fired bullets was maintained. The parties also stipulated that Tracy Konior, an employee of the Illinois State Police crime lab and an expert in firearms identification, received the recovered bullets and would testify that the bullets were both "of .357/.38 class caliber," and were fired from the same firearm. Konior would also testify that in her experience ".357 revolvers are less commonly used than 9mm or .40 caliber semiautomatic firearms."

¶ 40    The State then rested. Defendant moved for a directed finding, which the trial court denied.

¶ 41    Defendant then entered a stipulation that ASA Chris Costello presented Hutchens to the grand jury on September 13, 2018. Hutchens testified that she and Johnson went to Ward's house, where defendant was outside and Ward was inside. She further testified that Ward "talked

to her through a window and they told her, you didn't see us outside, you don't know nothing and that's about it." ASA Costello further stated in the stipulation that Hutchens did not testify before the grand jury that while walking to the store, defendant "whispered to her that someone is going to die today."

¶ 42    Defendant also presented a stipulation that Walter Collier III would testify that he was the forensic services manager of Shot Spotter, Inc. (Shot Spotter). He would further testify that at 17:39:29 local time on August 17, 2018, Shot Spotter sensors detected a series of acoustic pulses classified as three rounds of gunfire at the street address of 501 East 130th Street in Chicago, Illinois. At 17:15:56 local time on August 17, 2018, Shot Spotter sensors detected an acoustic pulse classified as one round of gunfire at the street address of 13037 South Rhodes Avenue, Chicago, Illinois.

¶ 43    Defendant then rested. The State did not present any evidence in rebuttal.

¶ 44    Following closing arguments, the jury began deliberating. During deliberations, the jury sent out a note asking, "Could we please receive further definition of or examples of legal responsibility and an example or definition of aid in the context of legal responsibility?" The court told the jury that they had all of the instructions and to continue to deliberate. The jury subsequently found defendant guilty of two counts of first degree murder. The jury found that the allegation that defendant was armed with a firearm during the commission of the murders was not proven.

¶ 45    Defendant filed a motion for new trial in December 2022 and raised several issues, including a claim that the trial court erred in denying his motion *in limine* to bar the State's introduction of the rap video because it was irrelevant and its admission substantially prejudiced defendant. The trial court subsequently denied defendant's motion.

¶ 46    While the parties discussed setting the date for defendant's sentencing hearing, defendant repeatedly interrupted the proceedings and asserted that he did not agree to setting his sentencing hearing in March. He interjected, "March nothing. You already know what you want to give me anyway." When the court responded that it did not know, defendant said, "We can do this right now." The court explained to defendant that it did not know what sentence it would impose because the court had not heard the sentencing evidence. Defendant responded, "This obviously against us anyway. So I'm ready right now." The parties, including defense counsel, agreed to a date for sentencing and the court asked for defendant to be taken back. Defendant then interjected, "She already know what she want to do. They did this wrong. They know what they doing, man. How we both charged on accountability? Who the f*** did it then?"

¶ 47    At defendant's March 2023 sentencing hearing, defense counsel presented defendant's *pro se* motion for a new trial alleging multiple claims, including ineffective assistance of counsel. The trial court discussed the motion and noted that many of defendant's allegations were addressed either at trial or in defense counsel's motion for a new trial. Regarding the allegations of ineffective assistance, the court conducted a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and denied the motion.

¶ 48    In aggravation, the State presented a certified copy of defendant's adjudication of delinquency for unlawful use of a weapon. According to defendant's presentence investigation report (PSI), defendant was sentenced to a year of probation in September 2017, then resentenced to a year of probation in March 2018, and probation terminated unsatisfactorily in January 2019. The PSI listed defendant's date of birth as March 29, 2002. The State also presented disciplinary reports from the JTDC.

¶ 49    The State further presented the grand jury transcript of Lakia Fisher, dated November 19,

2018. Fisher testified that in August 2018, she lived on the 400 block of East 133rd Street in Chicago and attended Fenger High School. At that time, Fisher had been dating Ward for three years. Ward lived across the street from Fisher. She also knew defendant as a friend of Ward. Fisher also knew both Turner and Flowers and considered them to be her friends.

¶ 50 On August 17, 2018, Fisher saw Ward at around 2 p.m. at Ward's house. Defendant arrived around 3 p.m. At one point, Ward and defendant were outside on the side of Ward's house to talk alone, but Fisher was able to hear their conversation from inside the house. She heard Ward and defendant discuss their plan to kill Turner and Flowers. She said Ward was panicking, but defendant told him not to worry. Fisher testified that they wanted to kill Turner and Flowers because Ward said there "was money on their heads." After defendant received a message from Flowers, he and Ward left to meet Turner and Flowers at the bus stop in front of the wooded area. Fisher later saw all four boys together in front of Ward's house. The boys walked to the woods, and Fisher heard gunshots approximately 40 minutes later. She saw Ward approximately an hour after she heard the gunshots and then defendant about 20 to 30 minutes later.

¶ 51 The next day, August 18, 2018, Fisher saw Morris, Turner's mother, looking for Turner around noon. Fisher saw Ward around 7 p.m. or 8 p.m. that night. Ward gave her a bag, and when she looked inside, it contained a gun. She described the gun as having a brown handle and with a cylinder that can spin and pop out and then back in. Ward told her not to give the gun to anyone or tell anyone that she had the gun. She hid the gun for two days. A few days later, Fisher spoke with Ward, and he told her that defendant killed "those boys," referring to Turner and Flowers. Ward then took the gun, and Fisher never saw it again.

¶ 52 The State then presented victim impact statements from Morris, Turner's mother, and

16

Reneau, Flowers's mother. Following arguments in aggravation and mitigation, the trial court sentenced defendant to 25 years for each first degree murder conviction, to be served consecutively, for an aggregate term of 50 years. Defendant moved to reconsider the sentence, which the trial court denied.

¶ 53    This appeal followed.

¶ 54    Defendant first argues that the trial court erred in denying his motion to bar the admission of the Facebook Live rap video. According to defendant, this rap video was not relevant to the case and was highly prejudicial to him because it discussed gang life, shooting, drug use, and drug sales. The State responds that the rap video was not prejudicial and "the admission of the video was a proper exercise of the trial court's discretion because a reasonable jury could have found that defendant's statements referred to his involvement in the murders of Flowers and Turner." Specifically, the State asserted that defendant's rap video was relevant to the issue of identify because the lyrics were an admission by defendant that "he was the shooter in the victims' murder."

¶ 55    Relevance is a threshold requirement that must be satisfied by each piece of evidence. *People v. Dabbs*, 239 Ill. 2d 277, 289 (2010). Rule 402 of the Illinois Rules of Evidence provides: "All relevant evidence is admissible, except as otherwise provided by law. Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 111 (quoting Ill. R. Evid. 401 (eff. Jan.. 1, 2011)). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ***." Ill. R. Evid. 403 (eff. Jan. 1.

2011).

¶ 56    The admission of evidence falls within the sound discretion of a trial court, and a reviewing court will not reverse the trial court's evidentiary ruling absent a showing of an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Id.*

¶ 57    The following transcription appears on the video presented to the jury. The video opens with the following typed in white on a black screen, "Youngboy~ion mean to break yo heart but baby thats what herpes do [followed by three emojis]." Then the video shows defendant and the transcription of defendant's rap is as follows.

> "Yo, gang shit (inaudible). The fuck ya'll (inaudible) like they let they Taco loose, don't come around no BGN and we don't fuck with you. Choppa and the cover that send me man he don't need a group and he ain't gonna stop blowing until them people discover you. If you with your homie I'm blowing leaving them cover too, while they all flexing claiming shit that they don't ever do, why they FaceTiming all these guns that they don't never use, hollow over his chest can't catch bro like he forgot the chew, catch 'em up impression they fake clutching like they always do they call me Shoota Shots because I'm quick to up and blow the two three hundred round drops straight from the Army with the soldiers use so if you see this Choppa bitches know that I belong a coup, grab the posse ya'll supposed to means I'm finna act a fool, pissed off mean to drip you but I hope that I don't shoot you grab body better get back when Shoota start approaching you, fuck Lil Nuk if he want smoke then he can have it too, all these

18

n*** buttons I'm pushing I'm trying to work and mew, get up in the woods

smoke a wood then bring that product through, thick bitch riding with thirty and

yes he got the jewels pulled to your face leave you froze and have your momma

blue."

¶ 58     The rap video was streamed on Facebook Live and brought to the attention of the police

by Morris, Turner's mother. The video is just over one minute long and shows defendant

smoking something before beginning his rap. Defendant sought to bar the introduction of this

video in a motion *in limine* before trial. He argued that there was "nothing in the video and [its]

lyrics that directly relate[d] to committing a murder" and nothing that implied or related to the

murder that formed the basis of the charges against defendant. He asserted that any probative

value was outweighed by the prejudicial effect to defendant.

¶ 59     During a hearing on the motion, the State argued that the lyrics were similar to the

circumstances of the murder and noted that defendant made references to "blowing leaving them

covered" and the victims "were found in the woods with leaves and all that type of thing

covering them." The State further pointed to lyrics in which defendant said, "they call me shoot

shots because I'm quick to up and blow the two, three hundred round drops" and the victims

were shot. The State noted that defendant referred to people "FaceTiming all these guns that they

don't ever use" and there were Facebook messages in which defendant stated that every person

was needed and implied that the victims were "not doing their share." Defendant also referred to

"a coup," and the State asserted the victims were executed as part of a coup within their group.

The State also observed that defendant referred to "get up in the woods. Smoke a wood, which is

what they did." The State explained that the murder happened in a wooded area of Golden Gate

Park and the four young men "were all smoking weed together before that happened." Finally,

19

the State noted that the video ended with defendant saying, "got the jewels pulled to your face.

Leave you froze and have your mama blue" and the victims were left in the woods and

"[o]bviously they were dead, frozen dead, and their mamas were sad or blue." The State

concluded by asserting that it was relevant but "[o]bviously it's open to interpretation."

¶ 60    In response, defendant argued that there was no date on the video, and they did not know

when it took place, "before, after, years before, months before." He contended that it was not

relevant because the date of the recording was unknown and was prejudicial because they did not

know anything about it "other than these interpretations that the State is going to try to make."

¶ 61    The trial court then denied defendant's motion and made the following findings.

> "I find that the State has made an argument as to its relevance. I don't
>
> think the prejudicial effect of this will outweigh—you could make your
>
> arguments that you just made as to what weight the jury should give this video,
>
> but I find that based on the State's argument it's—there is relevance to this video
>
> based on the comparisons with the case—the murder charges that your client
>
> faces. So for those reasons I'm going to deny your motion *in limine*."

¶ 62    In his posttrial motion, defendant again argued that admission of the rap video was error

because the video was irrelevant, immaterial, and "its admission resulted in substantial

prejudice" to defendant. Defendant further contended that the admission of the rap video "was

clearly used to imply the guilt of the defendant due to his creating the rap without anything to tie

it to the crime charged." At a hearing, the trial court denied defendant's motion and made the

following finding regarding the admission of the rap video.

> "As to [defendant], a major issue that you raised, [defense counsel], which
>
> was presented against your client was a rap video of your client. I did have a

hearing on that prior to allowing that in. I did allow that in.

I find that the State made a sufficient proffer at the time of my ruling and then it bore out during the trial where they did lay a proper foundation for that video. The video had your client rapping. There were words in that rap video that were used that the State argued can be interpreted in a way that the State argued should be interpreted by the jury.

You argued as far as a different interpretation. However, the jury chose to interpret it the way they wanted to. I found that it was admissible because it was relevant.

But nobody told the jury as far as the detective what he thought it meant. They were able to decide for themselves how they interpret that jury [*sic*]. Both sides were able to argue their sides.

I did find that that evidence was relevant. I did allow it in. I'm going to stand by that ruling. I don't find that it was an improper ruling."

¶ 63    Before this court, defendant maintains that the video does not relate to the murders at issue in this case. He points out that the neither the caption nor the video refer to the victims' nicknames of "Bibby" and "Herbo," but refer to "Youngboy," "Taco," and "Lil Nuk," and there was no evidence of anyone with those nicknames involved in the shooting.

¶ 64    Defendant relies on several nonbinding cases from other states for support. See *State v. Skinner*, 95 A.3d 236, 251-52 (N.J. 2014) (the New Jersey Supreme Court found that a "strong nexus between specific details of the artistic composition and the circumstances of the offense" is necessary in order to admit a defendant's artistic writings as probative evidence); *People v. Venable*, 88 Cal. App. 5th 445, 455 (Ct. App. 2023) (the Fourth District Court of Appeal was

considering the application of a new California state statute that "requires a trial judge to consider in addition that the probative value of such evidence is minimal absent certain markers of truth and that undue prejudice includes the possibility the evidence will inject racial bias and be used to improperly indicate the defendant's propensity for violence" (Cal. Evid. Code § 352.2(a) (West 2023))).

¶ 65    To begin, we note that decisions from foreign jurisdictions are not binding in Illinois. *People v. Wright*, 2013 IL App (1st) 103232, ¶ 66. "Although comparable decisions from other jurisdictions may be considered for their persuasive value, '[w]hen there is Illinois case law directly on point, we need not look to case law from other states for guidance' ***." *In re A.C.*, 2016 IL App (1st) 153047, ¶ 47 (quoting *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 395 (2005)).

¶ 66    Recently, our supreme court addressed the admissibility of rap lyrics in a criminal trial. *People v. Bush*, 2023 IL 128747, ¶ 61. In that case, the defendant was convicted of felony murder and the unlawful use of a weapon by felon after escalating events led to the shooting death of one victim and injury to a second person. *Id.* ¶¶ 1, 3. Prior to trial, the defense sought to admit the rap lyrics from one of the State's witnesses as a prior inconsistent statement and was barred by the trial court. *Id.* ¶ 55.

¶ 67    The evidence at trial disclosed that a dispute arose between two families after a man sold his mother's expensive belt to the son of the other family, but the original owner wanted her belt back. *Id.* ¶¶ 3, 12. Over the course of the day, the dispute intensified, including the police being called after a physical altercation. *Id.* ¶ 12. Eventually, groups from both sides converged in front of the house of the buyer's mother. Both sides "yelled back and forth" and "painted the other side as the aggressors." *Id.* ¶ 16. The group opposing the defendant claimed they were not armed,

but multiple witnesses testified that the group was armed with "knives, bats, and cans in socks." *Id.* The defendant displayed his gun and testified that one of the victims responded they had guns as well. After a struggle over a broom between the defendant's cousin and the victims, the defendant fired his gun because he was "scared." *Id.* ¶ 17. One victim was shot in the torso and died from his injuries while the second victim was shot in the arm and hospitalized. *Id.* ¶ 20.

¶ 68    On appeal, the defendant argued that the trial court erred in denying his motion *in limine* to admit the statement of a witness made in a rap video as a prior inconsistent statement. "The appellate court summarily rejected defendant's claim that the trial court abused its discretion in not admitting the video, stating that 'the rap video was made solely for entertainment purposes and was not akin to a prior statement by the witness.' " *Id.* ¶ 27 (quoting *People v. Bush*, 2022 IL App (3d) 190283, ¶ 112).

¶ 69    Before the supreme court, the defendant again contended that the trial court erred in denying his request to present the rap video as impeachment evidence and asked the supreme court to reject the appellate court's "work-of-art exception." *Id.* ¶ 55. The *Bush* court first reviewed the admissibility of the rap lyrics within the framework for prior inconsistent statements and found that the defendant had established each of the statutory requirements for admission. *Id.* ¶ 63. Noting the satisfaction of the statutory prerequisites for admission, the supreme court found the trial court's decision to deny the admission to be "arbitrary because it was based on the purported platform of the statements, a rap video, as opposed to the substance of the statements." *Id.* ¶ 61. The court further observed that there was "no work-of-art exception" under the statute for use of prior inconsistent statements. *Id.* "The proper approach is to treat prior statements the same way a trial court treats the admissibility of any piece of evidence." *Id.* ¶ 62. Thus, the court concluded that "the proper focus is the relevance of the prior statement." *Id.*

¶¶ 63-64.

¶ 70    The *Bush* court then focused its analysis on "what factors should be considered in determining the admissibility of song lyrics." *Id.* ¶ 64. The court reviewed how a few foreign jurisdictions approached this issue.

> "Some courts have held that a prior statement made in the context of a music video is admissible where the statement bears a 'strong nexus' to the 'circumstances of the underlying offense for which a person is charged.' [*Skinner*, 95 A.3d at 239]. Other courts have separated statements made in music videos into categories of 'admissible statements of historical fact' and 'inadmissible works of fiction.' *Hannah v. State*, 23 A.3d 192, 197 (Md. 2011). Both approaches help to determine whether statements made in a music video are relevant to a particular case." *Id.*

¶ 71    The *Bush* court then found that the rap lyrics at issue should have been allowed because the "statements in the video bear a 'strong nexus' to the events" in the case. *Id.* ¶ 65. The court observed that in the video, the witness started by "stating that what he is about to say is a 'true story' and 'true facts,' " and then referred to the date of the shooting and mentioned the nickname of the victim killed in the shooting. *Id.* He "describe[d] how he came to be at [the scene] at the time of the shooting, stating that he was picked up by his brother [the second victim] and was ready to go." *Id.* The supreme court thus concluded that the witness's "statements were statements of historical fact. The statements were relevant because they were directly related to the events at issue in this case. The exclusion of the statements was an abuse of discretion." *Id.*

¶ 72    Nevertheless, the supreme court held that this error was harmless because the statements

in the rap video were cumulative to other evidence presented at trial. *Id.* ¶ 67. The court found that "each relevant statement from the music video would have been cumulative to evidence that was presented at trial" and the defendant was not denied his right to a fair trial. *Id.*

¶ 73     We acknowledge that the supreme court in *Bush* considered the admission of the rap lyrics for a different purpose than at issue here, *i.e.*, the impeachment of a witness by the use of his prior inconsistent statements. Nonetheless, the court's guidance in considering the relevance of the rap lyrics is applicable in this case. Here, the State sought to admit the rap lyrics as substantive evidence against defendant, and we conclude the analysis still turns on whether those lyrics bore a "strong nexus" to the circumstances of the shooting.

¶ 74     Prior to the supreme court's holding in *Bush*, the Third District reached a similar conclusion when considering the relevancy of a rap video presented at trial. In *People v. Hastings*, 2022 IL App (5th) 190446-U,[1] the defendant was charged with armed robbery and aggravated battery with a firearm during which the victim was shot in the abdomen. The State filed a motion *in limine* for the admission of a video of defendant rapping at the trial. The video had been uploaded to YouTube, and the victim watched the video and recognized the rapper as the assailant in the armed robbery. The victim had not been able to identify the perpetrator prior to watching the video. *Id.* ¶ 5. The defendant opposed the State's motion and argued that the prejudicial effect of the video outweighed any probative value. *Id.* ¶ 6. The trial court allowed the admission of the video for the purpose of establishing identity of the perpetrator. During the trial, the victim testified that he was watching music videos while recuperating after the shooting and saw the defendant's video. He recognized the defendant as the person who shot him during the armed robbery. When the video was played for the jury, the victim identified the defendant.

---

[1]Nonprecedential orders entered under Illinois Supreme Court Rule 23(b) after January 1, 2021, may be cited for persuasive purposes. See Ill. S. Ct. R. 23(b), (e)(1) (eff. Feb. 1, 2023).

*Id.* ¶ 15. The victim explained that he did not identify the defendant in a photo lineup after the shooting because the victim could not see the individual's facial features in the photo. However, he was able to identify the defendant in the video based on his eye shape and long dreadlocks. *Id.* ¶¶ 15-16.

¶ 75    On appeal, the defendant argued that the trial court abused its discretion in allowing the video to be played at trial because the video was overly prejudicial. He asserted that the State could have presented the victim's identification through a still photo from the video. *Id.* ¶¶ 49-50. The State responded that the video was relevant for many reasons, including identity, motive, intent, absence of mistake, and the investigatory steps taken by the police. *Id.* ¶ 51. The State maintained that any claim of prejudice was speculative, and even if it was error, the error was harmless in light of the overwhelming trial evidence, which included the testimony from a codefendant. *Id.*

¶ 76    The reviewing court held that a reasonable trial judge could have found that it was appropriate to allow the jury to view the video to determine for themselves if the victim's failure to identify the defendant in the lineup photo was reasonable. *Id.* ¶ 53. The court concluded that the trial court did not abuse its discretion in allowing the admission of the video. *Id.*

¶ 77    While *Hastings* did not consider the substance of the defendant's lyrics in the video, the analysis is still persuasive for our discussion. As *Bush* and *Hastings* show, the admission of rap videos is an evidentiary issue within the trial court's discretion. See *Bush*, 2023 IL 128747, ¶ 57 (evidentiary motions are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion). Thus, the crucial question in determining the admissibility of a statement within a music video is whether the statement bears a "strong nexus" to the circumstances of the offense for which the defendant is on trial. *Id.*

¶ 64.

¶ 78     Turning to the facts in this case, defendant contends that the "lyrics bore no 'strong nexus' to the shooting for which [he] was on trial." He asserts the video appears to show him "engaging in braggadocio about gang conflicts generally." According to defendant, the video was not relevant to the shooting and "injected propensity evidence and implicit racial bias into his trial." We disagree.

¶ 79     The shooting occurred on August 17, 2018, when defendant and Ward went into a wooded area of Golden Gate Park with Turner and Flowers. Multiple gunshots were heard and only defendant and Ward were seen leaving the wooded area. The following day, Morris and Reneau reported their sons missing. Morris went around the neighborhood with fliers and asked people if they had seen her son. The bodies of Turner and Flowers were discovered by police in the wooded area near midnight on August 20, 2018. The rap video was streamed by defendant on his Facebook account approximately two months later. "[S]ome of the kids" from Fenger Academy called Morris and alerted her to the video's presence on Facebook Live, and she recorded the video. From this, it can be reasonably inferred that these students from Fenger Academy understood the lyrics to be referencing the murders and, in turn, notified Morris, the mother of one of the victims.

¶ 80     In accordance with the *Bush* court's holding, we find that the rap lyrics bear a strong nexus to the circumstances of the shooting for the reasons that follow. We point out that the video was brief, lasting just over a minute in length. The lyrics referenced Ward's nickname "Choppa" multiple times as well as defendant's own nickname "Shoota." The repeated use of Ward's nickname as well as his own nickname suggests that defendant and Ward had engaged in the actions described by the lyrics.

¶ 81    Specifically, the lyrics, "while they all flexing claiming shit that they don't ever do, why they FaceTiming all these guns that they don't never use," explicitly connect to the facts of this case. Multiple Facebook messages between defendant and Flowers were introduced at trial in which Flowers asked defendant about "the pipes" and defendant responded that there was a "war" and that "everybody in the field except you and Herbo," referring to Flowers and Turner. Defendant then said, "every pole is needed." Detective Kinney explained, both pipe and pole refer to a gun. Defendant's rap further stated, "catch 'em up impression they fake clutching like they always do," which again referred to individuals failing to use their guns. These lyrics demonstrate the motive for the murders after Flowers and Turner failed to participate in the gang war.

¶ 82    The lyrics, "If you with your homie I'm blowing leaving them cover too," implies the shooting of more than one person, even if defendant did not have an issue with both people. This lyric aligns with the shooting of two victims and again connects to the Facebook messages discussing Flowers's and Turner's lack of participation in the gang war. Defendant also bragged about his speed in firing gunshots, "quick to up and blow the two three hundred round drops straight from the Army with the soldiers use." While defendant's exaggeration about the number of gunshots was "braggadocio," this line has a kernel of truth when both victims were shot twice in the back. The evidence further established that both victims were shot with the same gun.

¶ 83    Additionally, the lyrics referred to "get[ting] up in the woods" and "smok[ing] a wood," and Hutchens testified at trial that kids would sometimes smoke marijuana in the woods. The State's theory of the case was that defendant and Ward took the victims into the woods with the intent to smoke marijuana. Instead, defendant and Ward shot both victims in the back. Defendant's lyrics mentioned to "grab the posse," which again appears to allude to the gang war

discussed in the Facebook messages. These premeditated murders could also have been considered the "coup," when defendant and Ward lured the victims to the woods and then shot them. Defendant warns victims in the lyric, "I hope that I don't shoot you grab body better get back when Shoota start approaching you." Again, the Facebook messages clearly depict the plan between defendant and Ward to lure Flowers and Turner to the woods where they carried out this murder.

¶ 84    The Facebook messages show Flowers contacted both defendant and Ward to discuss their plan to meet the day of the murders. Flowers told both defendants that he was with Turner at the park. Ward specifically sent a message to Flowers to contact him around the time of the murders. Meanwhile defendant and Ward discussed their plan to meet and defendant had some money. Ward also contacted another individual to obtain a .357 revolver. In contrast, defendant messaged Flowers that night, after the murders, that he was sick and had not left the house. Both defendants sent messages after the murders to both victims asking where they were as the victims' mothers searched for them. These messages described both defendants' plan to meet with Flowers and Turner and then their attempts to avoid suspicion after the fact as part of their "coup."

¶ 85    Further, the lyrics ended with "leave you froze and have your momma blue," which is strikingly similar to the bodies of Turner and Flowers left in the woods while their mothers looked for them. While the victims' mothers were searching, Turner's mother Morris specifically talked to defendant. When she showed Turner's picture to defendant, he denied knowing Turner, but then told her that he had seen Turner near the park the day he went missing. These lyrics unambiguously reference the mothers' fruitless searching and defendant's actions in leaving the victims "froze[n]" in death.

¶ 86    As previously observed, evidence is relevant when it has any tendency to make the existence of any fact that is of consequence more probable or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). And "[a]ll relevant evidence is admissible." Ill. R. Evid 402 (eff. Jan. 1, 2011). Defendant's rap lyrics were relevant and properly admissible for multiple reasons. The lyrics explicitly refer to details of the murders that only a participant would know. Moreover, the lyrics are supported by and correspond with the evidence presented at trial, including both defendants' Facebook messages and Hutchens's testimony. We also find that the rap lyrics were relevant to defendant's identity in the involvement of the murders because a reasonable jury could find his statements established that he was bragging about his participation in the murders of Flowers and Turner. The lyrics from defendant's rap were relevant to demonstrate motive and identity and were strengthened by the overwhelming evidence presented at trial. After reviewing defendant's rap in the context of the evidence at trial, we find that a strong nexus has been established in both the similarity to the facts as well as a temporal proximity because the video was streamed only two months after the murders.

¶ 87    Defendant contends that the admission of his rap lyrics raised a concern about racial bias in the public's perception of rap music. In support, defendant relies extensively on the New Jersey Supreme Court's decision in *Skinner*, but we find the circumstances in *Skinner* easily distinguishable from the facts in this case. *Skinner*, 95 A.3d at 253. The lyrics at issue in *Skinner* were found in three notebooks with the "profane and violent" rap lyrics written by the defendant in the first person. *Id.* at 239-40. Significantly, the State conceded that "many of the lyrics" obtained by the State and "read to the jury were composed long before the circumstances underlying the instant offense took place." *Id.* at 240. The *Skinner* court reviewed the admission

of the lyrics as evidence of prior bad acts and concluded that the prejudicial effect of the violent rap lyrics outweighed any probative value. *Id.* at 247, 251. The court concluded that a "strong nexus between specific details of the artistic composition and the circumstances of the offense" was necessary to admit a defendant's artistic writings as probative evidence. *Id.* at 251-52. We further observe that the *Skinner* court did not discuss racial bias in its analysis. *Id.* at 247-53.

¶ 88     In contrast, defendant's rap lyrics have demonstrated a strong nexus to the circumstances of the murders and were not admitted as evidence of prior bad acts. Defendant asserts that the lyrics at issue here refer to drugs and drug sales unrelated to the facts of the case. However, as defendant acknowledges, Hutchens testified that young people went into the woods to smoke marijuana. This testimony ties directly to the State's theory of the case, *i.e.*, defendant and Ward lured Flowers and Turner to the woods under the belief that they would smoke marijuana. Thus, the references to drug use relate to the facts of the case and support our finding of a strong nexus. The State did not discuss any other ambiguous drug references and focused only on the lyrics that connected to details of the crime. Accordingly, we reject defendant's contention that the rap lyrics added an implicit racial bias into the trial because the lyrics explicitly related to the circumstances of the murders.

¶ 89     We further find defendant's suggestion that it was not established when defendant wrote this rap lacks merit. As discussed above, the video was livestreamed on Facebook in October 2018 and viewed by Fenger Academy students who recognized the details in the lyrics and alerted Morris to the video. Morris explained how a Facebook livestream worked because she has used it. She described it as "a video where you can live stream what you are doing and what you are saying in that moment." Morris further stated that the video "can be played on your Facebook page for up to 24 hours." She then recorded the video and gave it to the police.

31

Lieutenant Kinney also testified that a Facebook Live video is streamed live but "[u]sually it's gone after 24 hours unless the accountholder decides to permanently post it on their Facebook page." Defendant has not offered any evidence to dispute this evidence that the video was posted as a livestream. Since it was streamed approximately two months after the murders occurred, the temporal proximity to the murders was very brief and supports the trial court's admission.

¶ 90    We also disagree with defendant's claims that the State "relied heavily on the rap." The State did not discuss the video in either its opening statement or initial closing argument and only discussed the video in rebuttal closing argument after defense counsel had argued that the video was irrelevant.

¶ 91    Additionally, we find the reasoning in some out-of-state cases to be instructive. Initially relied on by defendant, we find the Maryland Supreme Court's decision in *Montague v. State*, 243 A.3d 546 (Md. 2020), supports the State's position as well as the conclusion reached by our supreme court in *Bush*. In that case, the defendant contended that the lyrics from a rap recording were irrelevant, their probative value was outweighed by their prejudicial effect, and there was a minimal nexus between the lyrics and the details of the homicide. *Id.* at 556. The rap lyrics originated in a phone call the defendant made shortly before his trial while in custody. He spoke with an unknown man and made multiple statements "in the form of an amateur rap that he composed while incarcerated and awaiting trial," and the defendant asked the unknown man to record his rap lyrics. *Id.* at 553-54. The recorded rap "included lyrics that matched the details of [the victim's] murder" and "also made references to shooting 'snitches' and the recording was subsequently uploaded on Instagram." *Id.* at 551.

¶ 92    The *Montague* court first considered the rap lyrics relevancy and observed that evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence.' " *Id.* at 556 (quoting Md. R. 5-401 (eff. July 1, 1994)). The court noted this is "a very low bar to meet." (Internal quotation marks omitted.) *Id.*

¶ 93    The reviewing court observed that the danger of unfair prejudice is of special interest when the rap lyrics at issue are " 'insufficiently tethered' to the details of the alleged crime." *Id.* at 563 (quoting *Skinner*, 95 A.3d at 253). The *Montague* court discussed the consideration of the nexus between the lyrics and the circumstances of the crime and reasoned that "[w]hen such a nexus exists, and a jury can 'reasonably view the lyrics as factual, not fictional,' the risk of improperly admitting the lyrics as propensity evidence of the defendant's bad character significantly decreases." *Id.* at 564 (quoting *Holmes v. State*, 306 P.3d 415, 418 (Nev. 2013)). "When a defendant's rap lyrics are composed after the alleged crime occurs, the lyrics have a closer temporal nexus to that crime and are therefore more probative of the defendant's involvement." *Id.*

¶ 94    If the defendant-authored rap lyrics bear a close nexus to the details of an alleged crime such that the lyrics constitute direct proof of the defendant's involvement, they meet the low threshold for relevancy under Maryland rules of evidence and are admissible. *Id.* at 566. The relevance inquiry then shifts to a balancing of probative value against unfair prejudice. "[W]hen such a nexus exists, the probative value of defendant-authored rap lyrics is not substantially outweighed by unfair prejudice because the usefulness of the lyrics to the jury is not substantially overcome by their inflammatory character as propensity evidence." *Id.* at 566 (citing *Holmes*, 306 P.3d at 420).

¶ 95    When it considered these principles alongside the defendant's rap lyrics, the reviewing court concluded that while the defendant's rap lyrics include "some thematic elements native to

rap as a genre, and do not recount every detail of [the victim's] murder, the lyrics are relevant because they bear a close factual and temporal nexus to the details of [the victim's] murder." *Id.*

¶ 96 Both our supreme court and the *Montague* court relied on the Nevada Supreme Court's decision in *Holmes*, for support in their respective decisions. In that case, the defendant challenged the trial court's admission of rap lyrics of a song he wrote in jail while awaiting extradition to Nevada. *Holmes*, 306 P.3d at 418. The rap lyrics at issue paralleled the details of a robbery and murder where the assailants wore ski masks, turned out the victim's pockets, and tore a necklace from the victim's throat. *Id.* at 419-20. While the trial court "acknowledged that admitting gangsta rap carries the risk of it being misunderstood or misused as criminal propensity or 'bad act' evidence," the court found that the probative value was not "substantially outweighed by the danger of unfair prejudice." (Internal quotation marks omitted.) *Id.* at 418.

¶ 97 The Nevada Supreme Court recognized that "defendant-authored rap lyrics may employ metaphor, exaggeration, and other artistic devices, [citation], and can involve abstract representations of events or ubiquitous storylines. [Citation.] But these features do not exempt such writings from jury consideration where, as here, the lyrics describe details that mirror the crime charged." (Internal quotation marks omitted.) *Id.* at 419. It is one thing to exclude defendant-authored fictional accounts, whether rap lyrics or some other form of artistic expression, when offered to show a propensity for violence. *Id.* But "[i]t is quite another when the defendant-authored writing incorporates details of the crime charged." *Id.* The supreme court further rejected the defendant's assertion that the lyrics featured "cliched" references to robberies, finding that the "lyrics' lack of originality may reduce but does not eliminate their probative value. The extent of the lyrics' probative value was a matter for cross-examination, argument, or even, perhaps, expert testimony." *Id.* at 420.

34

¶ 98     The *Holmes* court also acknowledged that the rap lyrics carried a risk of prejudice but observed that the "real question is whether the lyrics' probative value was substantially outweighed by the danger of *unfair* prejudice." (Emphasis in original.) *Id.* The reviewing court pointed out that the trial court provided an appropriate limiting instruction, including that the jury could consider the defendant's statements, including the lyrics, as " 'confessions, admissions *or neither*' and that they could not use the lyrics as evidence of bad character or criminal propensity." (Emphasis in original.) *Id.* The supreme court concluded that even though the lyrics were prejudicial, the trial court did not abuse its discretion "in determining that the risk they carried of unfair prejudice did not substantially outweigh their probative value." *Id.*; see *Bryant v. State*, 802 N.E.2d 486, 498 (Ind. Ct. App. 2004) (The reviewing court found the defendant's rap lyrics relevant when the lyrics referred to finding a body in the trunk of his car and the victim's body was recovered from the trunk of her vehicle that the defendant had driven for several days and said belonged to him.); *Greene v. Commonwealth*, 197 S.W.3d 76, 86-87 (Ky. 2006) (The Kentucky Supreme Court rejected the defendant's claim that a video of him rapping about killing his wife was prejudicial character evidence because the defendant referred to his emotions and actions for the current offense, showed the murder of his wife was premeditated, and impacted his defense of extreme emotional disturbance by showing his mental state prior to the commission of the murder.).

¶ 99     Following our review of these cases, the common thread throughout, including by our own supreme court in *Bush*, is the necessity of a strong nexus between the lyrics or artistic work and the circumstances of the crime at issue. Absent such a nexus, the risk of unfair prejudice surpasses any probative value in their admission. The rap lyrics at issue in this case establish this strong nexus and demonstrate that the probative value outweighed any prejudicial effect. As the

*Montague* court observed, "When a defendant's rap lyrics are composed after the alleged crime occurs, the lyrics have a closer temporal nexus to that crime and are therefore more probative of the defendant's involvement." *Montague*, 243 A.3d at 564. The temporal nexus was also satisfied because the video was streamed a short time, approximately two months, after the commission of the murders. "Although there is no definitive line that demarcates the amount or content of lyrics that may be used appropriately, reasonableness should govern. The distinction between whether rap lyrics are more probative than prejudicial is a determination for the trial judge in the first instance." *Hannah v. State*, 23 A.3d 192, 205 (Md. 2011) (Harrell, J., concurring).

¶ 100    When the rap lyrics are considered along with the circumstances of the murders, it is clear that a strong nexus exists with the lyrics to the events and the trial court properly allowed the video into evidence. The probative value outweighed any prejudicial effect. Accordingly, we find no abuse of discretion occurred.

¶ 101    However, even if the admission of the video was error, we find that any error was harmless. An error can be harmless (1) where the error did not contribute to defendant's conviction, (2) where the other evidence overwhelmingly supports defendant's conviction, or (3) where the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *In re Brandon P.*, 2014 IL 116653, ¶ 50. In a harmless error review, the State bears the burden of persuasion with respect to prejudice. *People v. McLaurin*, 235 Ill. 2d 478, 495. (2009).

¶ 102    Contrary to defendant's assertion that the video "easily could have tipped the scales for the jury in a case hinging on circumstantial evidence," the other evidence of his guilt was overwhelming. First, the State presented the separate Facebook Messenger conversations between defendant and Turner, Flowers, and Ward. The parties stipulated that the information

received from Facebook established that an account with the username BG Shoota belonged to defendant, an account with the username BG Choppa belonged to Ward, an account with the username BG Herbo belonged to Turner, and an account with the username BG Bibby belonged to Flowers.

¶ 103   As detailed above, defendant told Flowers in a message that everyone was "in the field" of their turf war except Flowers and Turner. This set forth a motive for the killings, namely Flowers and Turner were not carrying their weight in the "war." There were multiple messages referring to the presence of guns, including Flowers asking both defendants about the "pipes" and defendant telling Flowers that "every pole [was] needed." Lieutenant Kinney testified that in his experience "pipes" and "pole" both referred to guns.

¶ 104   Significantly, these messages revealed the discussion defendant and Ward each had with the victims to arrange a place to meet the afternoon of the shooting, including references to the park. Messages between defendant and Ward indicated a plan for defendant to meet up with Ward. Ward also spoke with Flowers and Turner to coordinate meeting near the park.

¶ 105   Further, messages from Ward's account disclosed he discussed the trade of a 9-millimeter handgun plus $250 for a .357-caliber gun with another person. The parties stipulated that a firearms expert from the Illinois State Police crime lab would testify that the bullets recovered from the bodies of Flowers and Turner were both "of .357/.38 class caliber." Presnell thoroughly searched the wooded area for shell casings for over four hours using a metal detector, a hard rake, and a soft rake, but no casings were recovered from the crime scene. Lieutenant Kinney and Presnell testified that .357-caliber revolvers typically do not expel shell casings when fired; the casings remain in the firearm.

¶ 106   The testimony from Hutchens provided substantial details leading up to the shooting and

the day afterwards. Hutchens saw defendant and Ward with two boys she did not know in Golden Gate Park the afternoon of the shooting. She knew both defendants before that day. She walked with them to a store and on the way, defendant told her someone was "gonna die today." He also gave his and Ward's cell phones to Hutchens to hold onto. Hutchens then saw defendant and Ward enter the woods with the two boys. She later heard four gunshots and fled to her friend's house across from the park. Later that day, Ward came to retrieve his and defendant's cell phones from Hutchens. The following day, Hutchens and her friend met with defendant and Ward. Defendant and Ward told Hutchens and her friend that the girls were not outside that day, did not see defendant and Ward, and did not hear anything. Hutchens understood defendant to mean the day the shooting happened and that she did not see them going into the woods. Hutchens also identified both defendant and Ward to the police in separate photo arrays.

¶ 107   After the murders occurred, defendant created a false alibi and sent it to Flowers that he was too sick to leave his house that day. That false alibi was contradicted by his own messages as well as Hutchens's testimony and his admission to Morris that he saw Turner in the park the day of the shooting. He then deleted the alibi message from his account, but the message remained on Flowers's account since Flowers was already deceased and unable to delete it.

¶ 108   Additionally, both Reneau and Morris, the victims' mothers, reported the boys missing the next day. Reneau told the police that she was able to track Flowers's cell phone to a location near East 130th Street and South Eberhart Avenue in Chicago. Morris distributed missing person fliers of Turner and later received anonymous calls telling her to look near Golden Gate Park. Defendant spoke with Morris and initially denied knowing her son, but later said he had seen Turner at the park the day Turner went missing. This statement to Morris further contradicted defendant's message to Flowers that he had never left the house the day the murders occurred.

The police found the bodies of Flowers and Turner in the wooded area of Golden Gate Park. Flowers's cell phone was recovered from his pants. The victims were both shot twice in the back with no evidence of close-range firing. Further, there was evidence that Shot Spotter sensors detected a series of acoustic pulses classified as three rounds of gunfire at the street address of 501 East 130th Street in Chicago at 5:39 p.m. on August 17, 2018. Lieutenant Kinney had testified that the shooting occurred between 5:30 p.m. and 6 p.m. based on two 911 calls indicating multiple gunshots as well as the audio in the area detected possible gunshots. Given this overwhelming evidence of guilt, we find any error in the admission of the video was harmless.

¶ 109   Further, we find that the statements made in the rap video were cumulative to other properly admitted evidence presented at trial, which included the testimony from Hutchens, Morris, and multiple police officers, as well as the Facebook messages between the defendants and the victims. Therefore, each relevant statement from defendant's video was cumulative to properly admitted evidence that was presented at trial. See *Brandon P.*, 2014 IL 116653, ¶ 50 (harmless error can occur where the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence).

¶ 110   Defendant also contends that his trial counsel was ineffective for failing to object to the "unauthenticated and inaccurate" transcription of his rap video lyrics. At trial, the State included a captioned transcription in the recording of defendant's rap video that was played at trial. Defendant asserts that the transcription "appears to be inaccurate in places" and prevented the jurors "from interpreting the rap for themselves."

¶ 111   Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the United States Supreme Court

delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 112   Defendant argues that the State failed to lay the appropriate foundation for the admission of the transcription and his attorney's failure to make an objection constituted deficient performance. However, even if counsel's performance was deficient, which we do not find, defendant cannot establish the requisite prejudice.

¶ 113   First, to establish prejudice a defendant must show that the outcome would have been different. *Strickland*, 466 U.S. at 694. If counsel had objected to the foundation at trial, the State could have cured any error by laying a proper foundation for the admission of the video with transcription. See *People v. Diaz*, 377 Ill. App. 3d 339, 350 (2007) (finding that the defendant could not show "a reasonable probability of a different outcome because, even if defense counsel had opposed the admission of the [scientific] test, it is likely that the State would have

40

immediately cured the foundation deficiency by asking more questions concerning" the witness's experience and knowledge with the test); *People v. Rodriguez*, 313 Ill. App. 3d 877, 888 (2000) (observing that the State could have presented an alternative foundation for the admission of a tape, including a witness's prior testimony of its accuracy). Thus, defendant cannot show a reasonable probability that an objection would have prevented the admission of the transcription.

¶ 114    Second, the only inaccuracies alleged by defendant were minor and inconsequential to the meaning and references in the video. According to defendant, the captions do not appear "to be entirely accurate." He asserts that State's captions in the line, "The fuck ya'll see calling like they let Taco loose," is inaccurate. He contends that "what the State translated as 'see' sounds more like 'stay' or 'steady,' and 'Taco' sounds incorrect as well, and makes little sense." However, we point out that the captions do not include the words "see calling," but is noted as inaudible, "The fuck ya'll (inaudible) like they let Taco loose." The only other line contended as inaccurate is, "I'm trying to work and mew," because defendant asserts that " 'mew' cannot be correct" and refers to possible meanings in Urban Dictionary and the Merriam-Webster Dictionary, but none would make sense in the context of the video. None of these alleged inaccurate captions altered the meaning of the video such that there was a reasonable probability that he was prejudiced by its admission.

¶ 115    Third, and most significantly, even if the version of the rap video with the transcription was not admitted, the State had a copy of the original version of the video without captions. And as we concluded above, the admission of the rap video was proper. Since the rap video itself would have been introduced at trial either with a transcription or not, he cannot establish the requisite prejudice.

¶ 116    Further, any error in the transcription was cured in the jury instructions. The trial court

instructed the jury in accordance with IPI Criminal No. 3.20:

> "Finally, an electronic recording has been admitted into evidence. In addition to the electronic recording you're being given a transcript of the electronic recording. The transcript only represents what the transcriber believes was said on the electronic recording and merely serves as an aid when you listen to the electronic recording. The electronic recording, and not the transcript, is the evidence. If you perceive a conflict between the electronic recording and the transcript, the electronic recording controls." Illinois Pattern Jury Instructions, Criminal, No. 3.20 (approved Oct. 17, 2014).

Defendant fails to acknowledge that the jury was instructed on how to review the video and the transcript. As previously observed, "[a]bsent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *Wilmington*, 2013 IL 112938, ¶ 49. Therefore, any potential error in the transcription was cured by the court's instruction.

¶ 117   Since defendant cannot establish the requisite prejudice under *Strickland*, his claim of ineffective assistance of counsel fails.

¶ 118   Defendant next asserts that the trial court abused its discretion for allowing the admission of over a dozen photographs of the bodies of Turner and Flowers. Specifically, defendant argues that these images were not relevant to any issue before the court and only served to inflame the passions of the jury, depriving him of a fair trial.

¶ 119   Defendant admits that he failed to object to the photographs of the victims or include this claim in his posttrial motion. To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so

operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992).

Defendant asks this court to review this alleged error under the plain error doctrine, as well as for

his attorney's ineffectiveness for failing to properly preserve this issue.

¶ 120   Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) states that "[a]ny error, defect,

irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors

or defects affecting substantial rights may be noticed although they were not brought to the

attention of the trial court." The plain error rule

> "allows a reviewing court to consider unpreserved error when (1) a clear or
>
> obvious error occurred and the evidence is so closely balanced that the error alone
>
> threatened to tip the scales of justice against the defendant, regardless of the
>
> seriousness of the error, or (2) a clear or obvious error occurred and that error is
>
> so serious that it affected the fairness of the defendant's trial and challenged the
>
> integrity of the judicial process, regardless of the closeness of the evidence."
>
> *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215
>
> Ill. 2d 167, 186-87 (2005)).

However, the plain error rule "is not 'a general saving clause preserving for review all errors

affecting substantial rights whether or not they have been brought to the attention of the trial

court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather,

"Illinois's plain error rule is a narrow exception to forfeiture principles." *People v. Jackson*, 2022

IL 127256, ¶ 18.

¶ 121   Defendant carries the burden of persuasion under both prongs of the plain error rule.

*People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that this alleged error falls under

both prongs of the plain error test. However, "[t]he initial analytical step under either prong of

the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 122   As previously stated, to establish a claim of ineffective assistance of counsel under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. However, we conclude that we need not decide whether trial counsel was ineffective or whether plain error review would apply because defendant's claim regarding the crime scene and autopsy photographs fails on the merits.

¶ 123   In general,

> "[p]hotographs of a decedent may be admitted to prove the nature and extent of injuries and the force needed to inflict them, the position, condition and location of the body, the manner and cause of death, to corroborate a defendant's confession, and to aid in understanding the testimony of a pathologist or other witness." *People v. Richardson*, 401 Ill. App. 3d 45, 52 (2010).

"If photographs are relevant to prove facts at issue, they are admissible and may be shown to the jury unless the prejudicial nature of the photographs outweighs their probative value." *People v. Chapman*, 194 Ill. 2d 186, 219 (2000). "When a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact." *Id.* at 219-20. "Even gruesome or disgusting photographs may be properly admitted into evidence if they are relevant to establish any fact at issue in the case." *People v. Armstrong*, 183 Ill. 2d 130, 147 (1998). "If photographs could aid the jury in understanding testimony, they may be admitted even if cumulative of that testimony." *Chapman*, 194 Ill. 2d at 220. "The decision of whether a jury should be allowed to see photographs of a decedent is a decision that rests within the sound

discretion of the trial judge." *Id.* at 219.

¶ 124    Defendant contends that the "gruesome photos of Turner and Flowers's maggot-infested bodies were irrelevant to the only question before [defendant's] jury: whether [defendant] was responsible for their deaths." The photos "served only to horrify" and "prejudice" the jurors.

¶ 125    The State maintains that the pictures were properly admitted and no error occurred because the complained-of photographs showing the decay of the victims' bodies was "an inherent part of this crime, and analogous to any other unpleasant but probative effort" by the perpetrators to dispose of the victims' bodies. Specifically, the State argues that the damage suffered by the bodies before their discovery, as shown in the photographs, "directly related to 'the nature and extent of the injuries, the position, condition, and location of the body, and the manner and cause of death,' and also aided in understanding the testimony of the forensic investigator and medical examiner."

¶ 126    Defendant challenges the admission of 13 photographs: 6 of Flowers and 7 of Turner. Of these photographs, four were taken by Presnell, the forensic investigator, and nine by Dr. Khan, the medical examiner who performed both autopsies. In his testimony, Presnell used the photographs to explain where and how he discovered the bodies in the wooded area. He first discussed Flowers's body, which was found face down and photographed by Presnell in that position. He then rolled Flowers's body over to take photographs of his face, clothing, and to search his pockets. The photographs showed the state of decomposition, including the presence of maggots. Similarly, Turner was discovered face down and photographed by Presnell in that position, as well as when he was turned over to photograph his face and search his pockets.

¶ 127    The first two complained-of photographs taken by the medical examiner were presented during the testimony of Reneau and Morris and stipulated by the parties as how Flowers and

Turner looked in death. "A person cannot invite the trial court to take an action and then complain about that same action in a reviewing court." *People v. Trice*, 2017 IL App (1st) 152090, ¶ 59; see *People v. Kane*, 2013 IL App (2d) 110594, ¶ 19 ("A party who agrees to the admission of evidence through a stipulation is estopped from later complaining about that evidence being stipulated into the record."). Since defendant stipulated to the admission of these two photographs of the victims, he cannot now complain that their admission was in error.

¶ 128    The remaining complained-of photographs from the autopsies showed the injuries to the bodies as they arrived at the morgue, before the bulk of the maggots were removed during the autopsy process. These photographs were relevant to show both the condition of the victims' bodies, as well as understanding the medical examiner's testimony. See *Richardson*, 401 Ill. App. 3d at 52. The photographs were especially relevant since Dr. Arunkumar did not perform the autopsies but was able to discuss the injuries and condition of the bodies from Dr. Khan's report. For example, in reviewing a photograph of Turner's body, Dr. Arunkumar explained that "because of the maggots in the area, it was hard to make out if this was the entrance wound or the exit wound."

¶ 129    We are not persuaded by defendant's reliance on *People v. Garlick*, 46 Ill. App. 3d 216 (1977), and *People v. Coleman*, 116 Ill. App. 3d 28 (1983), and find both cases distinguishable. In *Garlick*, the defendant admitted to killing the victim and asserted insanity as an affirmative defense. Despite this admission, a gruesome photograph of the decedent's "massive head wound" was admitted at trial. *Garlick*, 46 Ill. App. 3d at 224. The defendant appealed and argued that the photograph of the decedent's head should not have been admitted because it was irrelevant and prejudicial given his admission that he committed the offense. The appellate court agreed with the defendant and ruled that the admission of the photograph "could serve no

purpose other than to inflame and prejudice the jury in the grossest manner" because the defendant had admitted his guilt and raised an insanity defense. *Id.* The reviewing court held that trial court erred in allowing the photograph to go to the jury because the photograph was "needlessly prejudicial." *Id.*

¶ 130   In *Coleman*, the jury was shown a color slide depicting "the decedent's decomposing, maggot-infested, partially autopsied body," which the appellate court found " 'absolutely hideous.' " *Coleman*, 116 Ill. App. 3d at 35. The photograph showed "[s]everal teeth [were] missing, and the brain [was] exposed and lying next to the head." *Id.* Significantly, the medical examiner testified that the slide was "of no use to him in establishing the identity of the decedent." *Id.* at 36. The *Coleman* court concluded that the photograph of "an autopsied, decomposed body" carried "extremely little probative value" in establishing the decedent's identity. *Id.*

¶ 131   In contrast to *Garlick*, the question of whether defendant committed the murders was very much at issue and as stated above, the State was entitled "to prove every element of the crime charged and every relevant fact." *Chapman*, 194 Ill. 2d at 219-20. Moreover, "the appellate court's comments [in *Garlick*] about the photograph were mere *dicta*, since the appellate court had already decided that a new trial was warranted on other grounds." *People v. Maldonado*, 402 Ill. App. 3d 411, 420 (2010). While the photographs showed the presence of maggots and the damage caused by them, and unlike in *Coleman*, the images were relevant to establish the effects of the maggots on the gunshot wounds as necessary for the medical examiner to determine the path of the bullets and injuries sustained by Flowers and Turner. Thus, the complained-of photographs were probative of the nature and extent of the victims' injuries.

¶ 132   To sustain defendant's first degree murder conviction, the State was required to prove,

among other things, that he performed an act that caused the deaths of Flowers and Turner. See 720 ILCS 5/9-1(a) (West 2016). Accordingly, the State was permitted to present evidence relating to whether defendant's actions caused their death. See *People v. Starks*, 287 Ill. App. 3d 1035, 1042 (1997) ("Regardless of the fact that defendant did not dispute the cause of death or the force used, the People may still prove every element and relevant fact of the offense charged, and if autopsy photos are relevant to establish any such fact, they are admissible despite their gruesome nature."). The complained-of photographs did just that; they showed how the bodies were discovered and their condition as well as the nature of the injuries and damage caused by both the gunshots and the maggots while the bodies remained in the woods. Since these photographs were probative to establish both relevant facts and the requisite elements of the murder charge, the trial court did not abuse its discretion in allowing the admission of these photographs. If there is no error, there is no plain error and counsel cannot be ineffective for failing to raise the issue. *People v. Johnson*, 218 Ill. 2d 125, 139 (2005). Thus, this claim fails.

¶ 133   Next, defendant contends that this court should vacate his *de facto* life sentence because the trial court's findings in aggravation were contradicted by the evidence presented at sentencing. Specifically, he asserts that the trial court erred by improperly relying on the JTDC disciplinary reports without hearing from a live witness and the trial court erred by considering facts in aggravation that should have been considered in mitigation.

¶ 134   "It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant." *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). "An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is in a better position to decide the appropriate sentence." *Id.* Accordingly, a trial court's sentencing decision will not be overturned absent an abuse of discretion. *Id.* "The reviewing court may not

48

reverse the sentencing court just because it could have weighed the factors differently." *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 28 (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991)).

¶ 135   "In determining an appropriate sentence, the trial judge is further required to consider all factors in aggravation and mitigation, which includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime." *Evans*, 373 Ill. App. 3d at 967. "If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007) (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 136   Defendant first argues that the trial court improperly considered defendant's disciplinary records from the JTDC without requiring the State to call a live witness. However, he failed to object to the admission of the disciplinary records, nor did he argue this alleged error in motion to reconsider his sentence. "In order to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Harvey*, 2018 IL 122325, ¶ 15. Although defendant filed a postsentencing motion, he did not set forth this alleged error in his motion. Accordingly, defendant has forfeited this claim on appeal.

¶ 137   Finally, defendant asserts that the trial court "mischaracterized the evidence presented at sentencing." Specifically, he argues that the court failed to comply with the consideration of applicable juvenile sentencing factors under section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2020)) because the court improperly considered some of the factors in aggravation, rather than mitigation. Defendant was 16 years old at the time of the commission of the offense.

¶ 138   Section 5-4.5-105(a) provides:

"(a) On or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing conducted under Section 5-4-1, shall consider the following additional factors in mitigation in determining the appropriate sentence:

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

¶ 139   Defendant does not argue that the trial court failed to consider his youth and attendant circumstances as required under section 5-4.5-105(a), but rather, he contends that the court found some of these facts weighed toward aggravation instead of mitigation. The State maintains that the trial court properly considered the statutory factors and "merely found some factors less mitigating than defendant claimed." The State points out that defendant "is not claiming that the trial court overlooked or misapprehended the applicable sentencing factors" but rather "the evidence should have been weighed more heavily in favor of mitigation." We review for an abuse of discretion whether the court failed to adequately consider the mitigating factors before imposing the sentence. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000).

¶ 140   Here, the trial court made extensive and detailed findings regarding the juvenile sentencing factors. The court stated that it had reviewed all documents before determining defendant's sentence. The court outlined the sentencing range of 20 to 60 years for first degree murder and that defendant's sentences would be consecutive since he was found guilty of killing two victims.

¶ 141   Turning to the factors, the court acknowledged defendant's trauma but observed that he was "very intelligent." The court recognized that defendant was 16, but while considering his impetuosity and maturity, the evidence did not show a lack of maturity, but rather found "just the opposite." The court observed that defendant was "able to consider the risk and consequences of

[his] actions."

¶ 142    The court then declined to find:

> "that you have cognitive or developmental disability at all. As I [stated], I find it's just the opposite. I don't find that you're subjected to outside pressure. I don't find there's any evidence of pressure on you as far as peer pressure or negative influences. I find that there was trauma in your childhood."

¶ 143    Regarding defendant's family ties, the court "recognize[d]" that defendant had a "very difficult complex relationship *** with both of [his] parents and [his] siblings" and that impacted him growing up.

¶ 144    In considering defendant's potential for rehabilitation, the court acknowledged it was a "difficult thing to be able to predict." The court then noted defendant's criminal history of a delinquency finding for unlawful use of a weapon. The court pointed out that "the evidence is clear, according to your prior criminal history as a juvenile, you didn't abide by a lot of things you were supposed to abide by. And as a matter of fact, and I want to make sure I have this clear, but you were on probation at the time of this offense." The court found that while defendant was "very smart," it did not "see" defendant's potential for rehabilitation and not to commit another criminal act.

¶ 145    Turning to the circumstances of the offense and defendant's participation in the commission, the court found defendant and Ward "preplanned" these killings, and noted it was not akin to a drive by shooting. Defendant and Ward took Turner and Flowers, who were both teenagers, "in the woods, shot in the back, and left for dead, and their bodies discovered a couple of days later rotted in an awful state to be returned to their families." The court further acknowledged that both defendant and Ward were found guilty under a theory of accountability

and "in this case the evidence bears out that both you and Mr. Ward did this together with the planning and the purpose of committing this murder."

¶ 146    The court also found that defendant was able to meaningfully participate in his defense and understood the legal process and the court noted defendant's disagreement with his trial counsel. The court further observed that defendant's account of the events was not credible because defendant admitted to spending the day with Turner and Flowers and then both boys went home. Defendant's timeline did not line up because the following day he "said that some of the victims' friends had contacted [him] to ask about them because they were found deceased" but the victims had not been found at that time. Defendant also suggested some "enemies" from a "turf war" killed them. Finally, the court acknowledged that defendant had a young daughter and his diagnosis of posttraumatic stress disorder. The court then sentenced defendant to two terms of 25 years, to be served consecutively.

¶ 147    After reviewing the trial court's thorough and detailed consideration of the juvenile sentencing factors under section 5-4.5-105(a), we conclude that the trial court did not abuse its discretion. The trial court went through each of the factors and explained its reasoning based on the facts and evidence presented. The court considered defendant's history as well as the circumstances of this offense to determine the appropriate sentence. While defendant disagrees with the weight the court gave to each of the factors in mitigation, this court may not reverse the sentencing court just because we might have weighed the factors differently. See *McWilliams*, 2015 IL App (1st) 130913, ¶ 28.

¶ 148    Additionally, we point out that under recent legislation, defendant will be afforded a parole hearing after serving 20 years of his sentence. "A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 *** shall be

eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences ***." 730 ILCS 5/5-4.5-115 (West 2020). Thus, defendant is not subject to a *de facto* life sentence. See *People v. Dorsey*, 2021 IL 123010, ¶ 54 (noting that courts look to the earliest opportunity for release to assess whether a *de facto* life sentence has been imposed); *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 54 (finding that "the legislature *** created the new parole statute and modified the parole review factors for the purpose of creating a meaningful opportunity for parole for juvenile offenders"); *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56 (finding the defendant did not receive "a *de facto* life sentence since he is eligible for parole").

¶ 149   Based on the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 150   Affirmed.

---

*People v. Colone*, 2024 IL App (1st) 230520

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-17744; the Hon. Ursula Walowski, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Erin K. Slattery, and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |

---